450 F.2d 1322
 78 L.R.R.M. (BNA) 2351, 146 U.S.App.D.C. 275,
66 Lab.Cas. P 12,075
 JOINT COUNCIL OF TEAMSTERS NO. 42 et al., Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent.
ASSOCIATED INDEPENDENT OWNERS-OPERATORS, Petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Joint Council of
Teamsters No. 42 et al., Intervenors.
 Nos. 24016, 24261.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued March 2, 1971.
Decided Sept. 24, 1971.
 
 Mr. Paul Crost, Los Angeles, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of Court, with whom Mr. Raymond W. Bergan, Washington, D. C., was on the brief, for petitioners in No. 24,016 and intervenors in No. 24,261. Mr. George A. Pappy, Los Angeles, Cal., also entered an appearance for petitioners in No. 24,016 and intervenors in No. 24,261.
 Mr. Carl W. Robertson, Los Angeles, Cal., for petitioner in No. 24,261.
 Mr. Seth D. Rosen, Atty., National Labor Relations Board, of the bar of the Supreme Court of Connecticut, pro hac vice, by special leave of Court, with whom Messrs. Arnold Ordman, General Counsel, Dominick L. Manoli, Associate General Counsel, and Marcel Mallet-Prevost, Asst. General Counsel, National Labor Relations Board, were on the brief, for respondent.
 Mr. Charles Both, Atty., National Labor Relations Board, also entered an appearance for respondent.
 Before FAHY, Senior Circuit Judge, and McGOWAN and MacKINNON, Circuit Judges.
 PER CURIAM:
 
 
 1
 These cases are before this court on petitions filed respectively by Associated Independent Owner-Operators Inc. (AIOO), and the Joint Council of Teamsters, No. 42, Construction Teamsters, Local Union No. 982, and General Teamsters, Chauffeurs, Warehousemen and Helpers, Local Union No. 982 (Unions), to review an order of the National Labor Relations Board. We have examined all of the issues raised; and we believe the only question meriting any extended discussion is whether the Unions violated Sec. 8(b) (4) (i) (ii) (A) and (B) of the National Labor Relations Act, by attempting to coerce affiliation with them of certain owner-operators of dump trucks.[1]
 
 
 2
 This provision of the Act prohibits union activities which are designed to compel a self-employed person to become a member of a union and to coerce an employer to cease doing business with other employers. AIOO asserted that the owner-operators were independent contractors and therefore self-employed for the purposes of the Act. Hence, AIOO claimed that the Unions were prohibited from employing secondary boycott tactics against these owner-operators. The Board panel, with one member dissenting, reversed a finding of its trial examiner, and decided that the owner-operators were employees of the employers involved. The portion of the General Counsel's complaint which was based upon AIOO's charges that the Union violated Sec. 8(b) (4) (i) (ii) (A) and (B) was dismissed because, in view of this finding, the Unions' actions were not directed toward "self-employed" persons nor did they cause "a cessation of business" within the meaning of the Act.
 
 
 3
 There are no facts in dispute. The only question we must determine is whether the Board's conclusion that the owner-operators were employees was derived from the proper legal standard and, if so, whether it is supported by substantial evidence.
 
 
 4
 * The events surrounding this controversy took place in the latter part of 1965 at three construction sites in Southern California: the relocation of Interstate Highway 99 in Costaic, California; the widening of Highway 10 in Baldwin Park, California; and the construction of a Sears Roebuck store in San Bernadino, California. The prime contractors for both of the highway construction projects (Guy F. Atkinson Corp. at the Highway 99 site and a joint venture headed by the Kasler Corp. at the Highway 10 site) each entered into agreements with truck rental firms (the J.K. Barker Trucking Co. and the Underwood and Payne Dump Truck Service, respectively) for the purpose of supplying the contractors with fully manned dump trucks. These trucks were utilized for the hauling of various materials on the construction sites.
 
 
 5
 The methods of supplying contractors with these trucks has apparently become, in the Board's words, "somewhat institutionalized" in the Southern California area. Each rental company provides contractors with trucks and operators. However, the contractor's demand often exceeds the rental firm's personal supply and, at that time, the latter relies upon subhauling agreements which it has entered into with several hundred independent dump truck owner-operators. The rental agency approaches a truck owner and offers him a job. Since each owner-operator himself enters into from twenty to thirty of these agreements with various rental companies, he often has prior commitments; and the subhauling agreements, taking this factor into account, give the owner-operator the right to refuse the offer. On the other hand, if the owner-operator accepts the rental agency's offer, he is bound by the terms of the subhauling agreement.
 
 
 6
 The subhauling agreements normally provide that the rental agency will pay the owner-operator 95 percent of the minimum hourly rate established by the California Public Utilities Commission, from which the rental company deducts a public utilities and Board of Equalization tax on behalf of the owner-operator.[2] Payments are made on a date certain during each month the owner-operator has worked on a project assigned to him by the rental company. Moreover, the agreements stipulate that, once an owner-operator has accepted an assignment, he must proceed to the place of loading and transport materials promptly and safely to the place of delivery. The agreements also specify that the owner-operator is to pay all fees, licenses, taxes, fines, workman's compensation insurance, public liability and property damage insurance, and operating expenses. No deductions are ever made by the rental agencies for the withholding of social security or state and federal income taxes.
 
 
 7
 The characteristics of the owner-operators are similar in all significant respects. They each own their own truck which is valued at approximately $20,000 and purchased without the advice of a rental agency or any contractor. In addition, each owner-operator normally has his name printed on the truck.
 
 
 8
 Following the usual procedures, Barker supplied Atkinson with six owner-operators on December 6, 1965, and Underwood supplied Kasler with anywhere from four to twenty-four owner-operators, depending on Kasler's needs, during a two week period in November 1965. The agreement between Atkinson and Barker expressly stipulated that all work and work schedules were to be supervised by Atkinson's project manager, and Atkinson also expressly reserved the right to reject or replace any driver whom Atkinson found incompetent or undesirable. Aside from these express agreements between Atkinson and Barker, there is undisputed evidence in the record, that, once an owner-operator reported to either of the two highway jobsites, he was subject to the supervision of the contractor, and that such supervision extended to directing the driver to the place of loading, instructing him where to park while waiting for his materials, and where and when his load was to be delivered. The job routine was the same whether the work was done by an owner-operator or an individual whose status as an employee was unquestioned. Moreover, although not provided for in his contract with Underwood, there was uncontroverted evidence that Kasler had a policy of removing incompetent or undesirable drivers. Finally, it was undisputed that both contractors controlled the time schedule at the jobsites and, in effect, kept the time records for the owner-operators.[3]
 
 
 9
 Ernest W. Hahn, Inc., was the prime contractor at the Sears project. It had subcontracted part of the work to Cal-West-Construction Co., who, in turn, sub-contracted excavation work to Lancaster Paving Co. In October, 1965, Lancaster used, in addition to its own loader and dump truck, a second dump truck which was rented from and owned by a general partnership and operated on the site by one of the general partners. Despite the fact that the general partner was a part owner of the truck, it was stipulated by all of the parties that, insofar as it is pertinent to this case, his status is similar to that of the owner-operators engaged on the highway projects. It was undisputed in the hearing before the trial examiner that the control and supervision of the general partner as well as his duties on the site were indistinguishable from the employee-driver of Lancaster Paving and the owner-operators at the highway sites.
 
 
 10
 The catalyst for the dispute at hand is that two of the owner-operators on the Highway 99 project, two of the owner-operators on the Highway 10 project, and the general partner on the Sears project, were not members of a union. Agents of the various Unions discovered the use of the non-union drivers on the projects and asked each of the owner-operators to join one of the teamster unions. All of the owner-operators refused, and the agents, inter alia, threatened both the contractors and the rental companies with picketing unless the non-union owner-operators were removed. Atkinson refused to remove the owner-operators from its project and Local 982 immediately picketed the site, thus forcing a shutdown. Atkinson relented and the two non-union drivers were asked permanently to quit the site. The other contractors found the threat of a shutdown sufficiently convincing and also dismissed the non-union drivers.
 
 
 11
 On the basis of these and related actions, AIOO filed charges against the Unions with the NLRB in December, 1965. The General Counsel based a consolidated complaint on these charges, and a hearing was held before a trial examiner. With regard to the issue at hand, the trial examiner found that the owner-operators were independent contractors and that the activity of the Unions was therefore unlawful. In making the finding, the trial examiner did not expressly indicate any legal theory upon which his decision was based, but he placed great weight upon the substantial financial investment made by the owner-operators in the purchasing and maintenance of their equipment. The examiner also noted that the owner-operators paid for all permits and insurance, that the permits and insurance were issued in their names, and that the owner-operators had no taxes or social security deducted from their payments.
 
 
 12
 A three-man panel of the Board, with Chairman McCulloch dissenting, reversed the trial examiner's finding that the owner-operators were independent contractors. The Board stated that the proper theory to be employed in making this determination is the "right of control" test. On the basis of this test, the Board examined several factors surrounding the use of the owner-operators at the various jobsites. While acknowledging the importance of the investment and expenses of the owner-operators in determining their status, the majority was swayed by the extent to which the owner-operators were supervised by the contractors once the former were on the job. Additional factors influencing the Board's decision were that the owner-operators had no control over their hours or the rate at which they would be paid.
 
 II
 
 13
 Our review of the Board's determination must begin with the Supreme Court's opinion in N.L.R.B. v. United Insurance Co., 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), where it was said that common law agency principles are to be utilized in differentiating between an employee and an independent contractor for the purposes of the Act. The Court emphasized the constraints which attend upon judicial review of a Board determination of this nature. The Court explained that while "such a determination of pure agency law involved no special administrative expertise that a court does not possess, * * * [it] should not be set aside just because a court would as an original matter decide the case the other way." Id. at 260, 88 S.Ct. at 991.
 
 
 14
 The traditional common law test utilized in distinguishing between an employee and an independent contractor is the examination of the right and extent of control reserved by those for whom the individual in question is working. See, e. g., N.L.R.B. v. Phoenix Life Insurance Co., 167 F.2d 983, 986 (7th Cir.), cert. denied, 335 U.S. 845, 69 S.Ct. 68, 93 L.Ed. 395 (1948). This court in Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679 (1945), has stated:
 
 
 15
 The vital element which negatives such independence in the relation between employer and employee, is the right to control the employee, not only as to final result, but in the performance of the task itself. And, it is the right to control or supervision itself, which is most important.
 
 
 16
 80 U.S.App.D.C. at 55, 148 F.2d at 681 (emphasis added). See also Restatement of Agency (Second) Sec. 220(1) and (2) (1957).
 
 
 17
 This test, of course, was the one which the Board clearly articulated in its opinion. In examining the relationship of the owner-operators with the contractors, the Board noted that all of the indicia of control-the detailed supervision of the loading and delivery of materials, the right of termination, the record keeping by the contractors, the scheduling of the work-were in the hands of the contractor.
 
 
 18
 AIOO attacks the finding of the Board on three different grounds. First, it attempts to rebut the Board's findings with regard to control by focusing on the contractors' supervision of the owner-operators. AIOO argues that the supervision offered by the contractors was superficial in that it was merely geared toward the result to be accomplished rather than toward the details by which the owner-operators were to achieve that result. We believe that the record undercuts this argument. As we understand it, the result to be accomplished by the owner-operators was the delivery of certain materials in their dump trucks to a specific location on the job site. Yet, as mentioned earlier, the contractors supervised the loading of the dump trucks to the extent of assigning the owner-operators places to park their trucks while they were waiting for their turn at the loader. In addition, the project directors on all three sites were concerned with the timing of all the operations, and hence the owner-operators were not even free to discharge their loads at their own convenience. Any greater control of the owner-operators would have been unrealistic. It would have been impossible and impractical for the contractors to monitor and direct, for example, the manner in which the owner-operators drove their trucks. Moreover, there was evidence introduced at the hearing demonstrating that the owner-operators on all three sites were given the same degree of supervision as those drivers who were clearly employees of the contractors. It would be unreasonable to suggest that, in order for the owner-operators to be considered employees, they would have had to receive a greater degree of supervision than regular employees.
 
 
 19
 Finally, it is well established that the "control" test not only contemplates the degree of control actually exercised, but the degree to which the principal may intervene in the control of an employee's performance. See, e. g., Radio City Music Hall Corp. v. United States, 135 F.2d 715, 717 (2nd Cir. 1943). Courts have even held that an owner-operator over-the-road driver who, by the very nature of his work, is given little direction with regard to the manner of reaching his destination and the manner of delivery, may be deemed an employee, rather than an independent contractor, if the principal explicitly or implicitly reserves the right to supervise the details of his work. See, e. g., Deaton Truck Line, Inc. v. N.L.R.B., 337 F.2d 697 (5th Cir. 1964), cert. denied, Teamsters, Chauffeurs, Warehousemen & Helpers, Local Union 612 v. N.L.R.B., 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965). Atkinson, in its contracts with Barker, had explicitly reserved the right to supervise the work of the owner-operators, and the record makes clear that the two other contractors in practice had exercised pervasive control over the owner-operators. They, too, could have intervened to a greater extent had they desired to do so.
 
 
 20
 AIOO's second argument is that the Board did not place sufficient emphasis on the financial investment of the owner-operators and the fact that they bore their expenses. See Restatement, supra, Sec. 220(2) (e) and comment k. As mentioned earlier, these factors convinced the trial examiner that the owner-operators were independent contractors. The Board did take these factors into account when it reached its decision, but found on balance that the extensive control exercised by the contractors was conclusive. We believe that the Board's view comports with sound reasoning. For the essential factor in these matters is control, and while indicia of ownership are important in such a determination, it is "only because of the inference of right of control arising from ownership. But if the owner, as part of the agreement to perform service, surrenders complete dominion of the instrumentality and the right to decide how it should be used * * *, then the fact of ownership loses its significance." N.L.R.B. v. Nu-Car Carriers, Inc., 189 F.2d 756, 759 (3rd Cir.), cert. denied, 342 U.S. 919, 72 S.Ct. 367, 96 L.Ed. 687 (1951). In the present matter, by virtue of their working arrangement with the contractors, the owner-operators have either explicitly or implicitly agreed to surrender dominion over their trucks. The importance to be attached to the ownership of the equipment is thereby diminished.
 
 
 21
 Finally, AIOO argues that the Board's finding is inconsistent with Associated Independent Owner-Operators, Inc. v. N.L.R.B., 407 F.2d 1383 (9th Cir. 1969), an opinion which comprised the basis of Chairman McColluch's one-paragraph dissent from the finding with regard to this matter. In Associated, the Ninth Circuit held that the Board's finding that certain owner-operators were employees was not supported by substantial evidence and that, in fact, the owner-operators were independent contractors. However, there are significant variations in the facts.
 
 
 22
 Associated concerned two owner-operators who were involved in grading and excavation work using equipment known as skip-loaders. The court in that case utilized, for the purposes of analysis, ten criteria which were developed by the Restatement of Agency (Second).[4] These criteria are a refinement of the common law "right of control" test and are meant to serve as guideposts in determining whether a worker is an independent contractor or an employee. The Associated court found that the factors surrounding the employment of both owner-operators evidenced characteristics which were relevant to seven of the Restatement's criteria. As to all seven relevant criteria, the court found that the owner-operators' relationship with their contractors indicated that they were independent contractors rather than employees. The court made the following findings with regard to each of the relevant criteria:
 
 
 23
 1. The owner-operators in Associated owned their own equipment and were paying all relevant expenses. See Restatement, supra Sec. 220(2) (e) and comment k.
 
 
 24
 2. The owner-operators were given only "negligible supervision" by the contractors in the accomplishment of their tasks "[A]nd there [was] no evidence that the supervisors had the right to or did exercise control over the details of the [owner-operators] work." 407 F.2d at 1387. See Restatement, supra Sec. 220(2) (a) and comment 1.
 
 
 25
 3. Moreover, evidence had been introduced at the trial examiner's hearing tending to demonstrate that in the Southern California area generally skip-loader operators received minimal supervision in carrying out their tasks. This factor was especially true when such services were performed for homeowners, who comprised a substantial percentage of the skip-loader's employers. However, this was also found to be true, although to a lesser extent, when skip-loaders performed for contractors. See Restatement, supra Sec. 220(2) (c).
 
 
 26
 4. There was no continuing relationship between the skip-loaders and their contractors. Once a specific job was complete, the owner-operator was under no further obligation to the contractor. Moreover, whether the owner-operator was asked to do a similar job in the future was completely dependent upon the success of his prior performance. See Restatement, supra Sec. 220(2) (b).
 
 
 27
 5. Evidence had been introduced which indicated that grading and excavation was widely thought to be a distinct occupation. See Restatement, supra Sec. 220(2) (b).
 
 
 28
 6. Evidence had been introduced which tended to demonstrate that the operation of a skip-loader required a relatively high degree of skill. See Restatement, supra Sec. 220(2) (d).
 
 
 29
 7. Finally, the skip-loader owner-operators were paid on an hourly basis, which the court felt to be, when viewed alone, an indication that they were employees. However, there were three additional factors which that court found to cut against such a conclusion. First, the owner-operators, rather than the contractors, set the amount of remuneration for the jobs in question. Second, the court felt that the amount paid by the contractors could not be considered a wage since the payment partially covered the use of the equipment which the owner-operators had to maintain. Moreover, no money was withheld from the payment of the owner-operators for social security or federal or state income taxes. Third, the contractors kept no record of the owner-operators' hours as they did for their other employees. Each owner-operator submitted his own statement of his hours to the contractor and then billed the contractor accordingly. Hence, the court concluded that even in the method of payment the owner-operators resembled independent contractors rather than employees. See Restatement, supra Sec. 220(2) (g).
 
 
 30
 The only significant similarities between the owner-operators in Associated and in the case before us are the ownership and expense factors, the lack of a continuing relationship with the contractors involved, and the fact that the truck owner-operators were paid on an hourly wage scale without any deductions for taxes or social security, part of which payment was to meet their equipment expenses.
 
 
 31
 On the other hand, the truck owners in the case before us were under substantial supervision. Moreover, there was no evidence introduced in the case before us which would tend to suggest that the hauling of materials in a dump truck was considered a distinct occupation or one which was viewed in the locality as an occupation which was generally done with minimal supervision. Also no evidence was introduced which tended to suggest that the tasks performed by the owner-operators in question required any significant degree of skill. Lastly, the truck owner-operators did not keep their own hours nor did they bill contractors for their time.
 
 
 32
 Hence, even assuming that all of the Restatement criteria are of equal significance and that one can reach a decision merely by a quantitative determination, the owner-operators before us evidence, at best, only three characteristics which tend to indicate that they are independent contractors, while four other characteristics tend to indicate that they are employees. Given the Supreme Court's admonition that "a court may not displace the Board's choice between two fairly conflicting views," we are constrained to allow the decision of the Board to stand.
 
 
 33
 Affirmed.
 
 MacKINNON, Circuit Judge (dissenting):
 
 34
 I agree with the majority's conclusion that N.L.R.B. v. United Insurance Co., 390 U.S. 254, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968), contains the general principles which must control our disposition of this case. Thus I agree that we "should apply the common-law agency test" in determining whether the AIOO petitioners are employees or independent contractors. Id. at 256, 88 S.Ct. at 990. See Deaton Truck Lines, Inc., 143 NLRB 1372, 1375 (1963), app. dismissed, 337 F.2d 697 (5th Cir. 1964), cert. denied, 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965). Furthermore, I agree that if we were presented with "two fairly conflicting views," the Board's resolution of the issue would control. Id. at 260, 88 S.Ct. 988. With all respect to my brethren, however, I cannot agree that there exist two such views about the status of the AIOO petitioners.
 
 
 35
 "In such a situation as this there is no shorthand formula or magic phrase that can be applied to find the answer, but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive." Id. at 258, 88 S.Ct. at 991. However, even if we were to review the Board's decision through a somewhat mechanical application of the ten indicia contained in Restatement (Second) of Agency Sec. 220 (hereinafter "Restatement"), it seems to me that we would have to conclude that the record in this case does not contain substantial evidence to support the conclusion that the owner-operators were "employees."
 
 
 36
 To be sure, the nature of the truck services furnished provided the general contractors in these cases with considerable control over some of the details of the operations performed by the AIOO drivers. The Board so found and held, in my opinion correctly, that the existence of this right to control the operators in the performance of their assigned tasks was one factor which apparently pointed toward their status as employees.[1] Restatement Sec. 220(2) (a). In addition, though the Board did not specifically so find, the record supports the conclusion that the general contractors were in business and that the work performed by the owner-operators constituted a part of that business. Both of these factors point toward employee status. Restatement Sec. 220(2) (j) and (h). Finally, it can perhaps be assumed that the general work performed by the instant owner-operators was normally done under some "supervision" of the contractors for whom such services were being rendered. While this factor has some features that might be indicative of employee status, Restatement Sec. 220(2) (c), it is equivocal because the type and extent of supervision and not supervision per se have a strong bearing on the category into which the operators are to be placed.
 
 
 37
 I believe, therefore, that there is substantial evidence in the record to support three of the ten relevant factors, and possibly a fourth, which point toward employee status. The remainder, in my view, point toward the status of independent contractor. Though the record is equivocal and the Board made no explicit findings on the issue, it seems to me that the evidence indicates that the work in which the truck owners engaged constituted a distinct occupation in California. Restatement Sec. 220(2) (b). Indeed, so widespread was the practice of utilizing separately owned, owner-operated heavy earth-moving equipment on construction jobs, that a highly organized system of independent brokerage had arisen and the California Public Utilities Commission had undertaken to regulate many incidents of such activities. Moreover, operation of the equipment required a high degree of skill. Restatement Sec. 220(2) (d). Some of the instant operators owned ten-wheel, ten-yard dump trucks and others owned large cement trucks. Operation of such vehicles, on a construction site or highway, is not a task for the untrained or unskilled. The owner-operators supplied the "instrumentalities" of their own work, Restatement Sec. 220(2) (e), namely, their highly specialized trucks. These trucks were purchased according to the owners' individual preferences and cost up to $20,000.00 each. The work for any one construction company was sporadic and temporary, with independent job mobility being the general rule regarding the owner-operators. Restatement Sec. 220(2) (f). It is true that the operators were paid by the hour, and this factor is one which would normally point toward employee status. Restatement Sec. 220(2) (g). However, the force of this point is blunted when one considers that (1) the California Public Utilities Commission set minimum hourly rates for the trucks and that these minimum rates were often the ones actually paid; (2) the truck operators frequently kept their own time records which were approved by the onsite construction foreman and then sent by the operator to the broker who used them in billing the construction company; (3) the hourly rate paid the operators was not simply "wages" but a combined hourly payment for truck and man, out of which the owner was required to pay the driver and the expenses of operating the truck which included gasoline, oil, tires, depreciation, license fees, maintenance, repairs, insurance, etc. Compare, Associated Independent Owner-Operators, Inc. v. N.L.R.B., 407 F.2d 1383, 1386 (9th Cir. 1969). Finally, the parties themselves did not, in my view, believe that they were creating the relationship of employer and employee. Restatement Sec. 220(2) (i). The one contract between a construction company and a broker introduced in evidence-a contract styled an "Equipment Rental Agreement"-, pursuant to which the instant AIOO petitioners were engaged, contained the following clause:
 
 
 38
 The Lessor [broker] is an independent contractor and all persons employed by Lessor in connection herewith shall be his employees and not employees of the Contractor [construction company] in any respect whatsoever.
 
 
 39
 Moreover, the construction companies and the owner-operators acted as if they did not believe that they were in the relationship of employer and employee. Each operator was required to, and did, carry his own liability insurance. Each paid his own property taxes. Each paid his own maintenance costs. Each was free to hire substitutes to perform the work required to operate the construction equipment he had rented. (This removed the personal element so frequent in a true employment relationship.) None had deductions for income taxes and Social Security removed by the construction company from the amounts due him for the services he had performed.
 
 
 40
 In sum, there are six factors which point toward the status of the owner-operators as independent contractors and only three which clearly point toward their status as employees. Were "score" determinative, I would be forced to declare the owner-operators independent contractors, 6-3.
 
 
 41
 Score is not, of course, determinative, and the sum of individual criteria does not determine a "winner." Like my brethren, then, I decline to rest my views entirely on the analysis just undertaken. Clearly some of the above factors are more important than are others for resolution of the problem before us. Which factors these are is revealed by an examination of the purposes for which the Restatement test was formulated.
 
 
 42
 Comment (c) to Restatement Sec. 220 states:
 
 
 43
 The relation of master and servant is one not capable of exact definition. It is an important relation in that upon it depends the liability of the master to third persons and to his employees under the provisions of various statutes as well as under the common law. * * *
 
 
 44
 Following the same theme, Comment (a) states:
 
 
 45
 The word ["servant"] indicates the closeness of the relation between the one giving and the one receiving the service rather than the nature of the service or the importance of the one giving it. * * * The rules for determining the liability of the employer for the conduct of both superior servants and the humblest servants are the same; the application differs with the nature and extent of their duties.
 
 
 46
 The thrust of these comments is given added force when one views the Restatement (Second) of Agency as a whole, for such a view reveals that the Institute has attempted primarily to determine and enunciate the rules governing liability of an employer for injuries to and by his employees. In attempting to set guidelines for such liability, it is clearly rational to place heavy, and perhaps the heaviest, emphasis on the amount of control which the employer has a right to exert over the details of another person's actual performance of a given task. The more control he has a right to exert, the more one would be inclined to hold him responsible, under traditional theory, for injuries which his employee's performance of that task engendered.[2]
 
 
 47
 The conclusion that the instant operators would be employees under one application of Sec. 220 if the question were whether the construction company would be liable to a person crushed beneath one of the trucks does not, however, mandate a conclusion that they would also be employees for purposes of the National Labor Relations Act.[3] True it is that Congress evinced an "intent" to have the employer-employee relationship determined by general agency principles when it amended the Act in 1947. N.L.R.B. v. United Insurance Co., 390 U.S. 254, 256 & n. 2, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). Even under general principles, however, the determination of employee status is a functional one, and the same person is not necessarily an employee for any and all purposes. See generally Restatement Secs. 228-249.
 
 
 48
 Just as heavy stress must rightly be placed on one person's right to control the actual performance of the specific incident out of which an injury arises when the question concerns the liability of the employer, heavy stress must be placed on the control embodied in the entire relationship when the question is whether an individual is an employee for purposes of the National Labor Relations Act. The pervasive, unilateral control exerted by employers over all aspects of the employer-employee relationship-and even over the lives of the employees-as well as the attempts to repress all concerted effort to balance the scales, were two prime forces among those which generated the Act. These forces cannot be ignored in determining the incidents of control which bring individuals within the reach of its protection.[4] In my view, then, one must look to the control embodied in the entire relationship, and not simply that embodied in directing performance of a given task, to determine who are employees for purposes of the National Labor Relations Act.[5]
 
 
 49
 The Board itself has recognized and applied the above distinction. In practical terms, it means essentially this:
 
 
 50
 Where the person for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished, the relationship is one of employment. On the other hand, where the control is reserved only as to the result sought, the relationship is that of an independent contractor. The resolution of this determination depends on the facts of each case. * * *A. Paladini, Inc., 168 NLRB 952 (1967) (emphasis supplied). In the instant case, it appears that the general contractors merely exercised control over the results which they desired. Although the type of operations involved necessitated the exertion of more specific authority than might be present in other more simple types of independent contractor relation-ships-yet far less than that which would be normally expected in a relationship as complex as that involving the erection of a building by an independent contractor-I believe that the amount of power invested in the contractors was not sufficient to indicate the existence of an employment relationship. They did not possess the authority to control the "manner and means" by which each job was to be performed within the meaning of Paladini. See 168 NLRB at 953. They did not dictate the specific types of trucks which the owner-operators had to utilize, nor did they exercise extensive supervision over every phase of the operations. See Deaton Truck Lines, Inc., supra, 143 NLRB at 1375-1376. They merely exercised that amount of authority which was basically necessary to insure the accomplishment of the specific jobs contracted for. This control factor is clearly part of every independent contractor relationship, and the Board and courts must be careful to distinguish such minimal control from the extensive authority which accompanies a true employment relationship.
 
 
 51
 When examining Restatement Sec. 220 with the preceding analysis in mind, several factors therein listed assume a dominant importance. Among these is the length of time it is intended that the person will be engaged. Restatement Sec. 220(2) (f). Here the relationships were not intended to be ongoing ones. Owner-operators were engaged by the job only, and each such job might last only a few days or a few months. A long and continual dependence on the ability of a given general contractor to locate sufficient work to enable it to provide an owner-operator with a livelihood was not envisioned by the parties. Of equal importance is the fact that the owner-operators themselves supplied the expensive and complex machinery which enabled them to engage in their independent businesses and permitted them to move freely from job to job. Restatement Sec. 220(2) (e). Their own ability to raise capital and maintain credit, and not that of the construction companies, was the primary factor which determined whether they would be able to maintain themselves and their families. They had to bear the financial risks involved regarding their equipment. Compare A. Paladini, Inc., supra, 168 NLRB at 952-953. Moreover, the skill which they themselves had acquired in one way or another determined whether they could be licensed to operate their vehicles. Restatement Sec. 220(2) (d). The owner-operators are not individuals whose acquisition of relevant skills depended upon exposure to machinery, personnel and jobs provided by a specific general contractor. Finally, the parties clearly did not believe that they were creating an employer-employee relationship. The construction companies were primarily interested in the trucks possessed by the owners, as the rental agreements make clear. Whether these operators worked was thus controlled not so much by whether the construction companies needed men, as by whether they needed the equipment which the operators owned. Furthermore, if the truck ran out of gas, and the owner did not fill the tank, he did not work. If it broke down, and the owner did not have it repaired, he did not work. If the taxes on the truck were not paid, and the owner did not pay them, he did not work. If the owner did not obtain the requisite insurance, he would not be engaged by the construction companies. All this was by agreement of the parties.
 
 
 52
 In sum, I do not find in this record substantial evidence that the significant aspects of control required for purposes of the Act's coverage were possessed by the construction companies. Believing as I do that the truly relevant incidents of control must be found in those areas of the relationship beyond the simple direction of work involved here, before N.L.R.A. coverage is imposed, I am forced to conclude that the parties were independent contractors. I therefore respectfully dissent.
 
 
 
 [1]
 The union petitioners claim that the Board erred when it found that certain provisions of agreements entered into between the Unions and various highway contractors and truck rental agencies were violative of Sec. 8(e) of the Act, which makes it unlawful to enter into "any contract or agreement express or implied" whereby an employer agrees not to handle the products of another or agrees to cease doing business with any other person. The Unions likewise argue that the Board's finding that the Unions violated Sec. 8(b) (4) (i) (ii) (A) and (B) of the Act by coercing certain contractors and rental firms to maintain, reaffirm, and give effect to provisions of collective bargaining agreements prohibited by Sec. 8(e) was incorrect. These findings appear to us to have adequate support in the record
 
 
 [2]
 The agreement between the contractors and the truck rental firms call for the contractor to pay the firm the minimum hourly California PUC rate. The truck rental firm makes a 5 percent broker's fee
 
 
 [3]
 While the owner-operators kept track of their own time at both highway construction sites, their time sheets had to be presented daily to the project manager who would carefully check the sheet to make certain that it was accurate. If there were any discrepancies between the amount of time reported and the amount of time the project manager had noted down, the driver was normally compelled to revise his time sheet accordingly
 
 
 [4]
 The relevant provisions of the Restatement are as follows:
 Sec. 220. Definition of Servant
 (1) A servant is a person employed to perform services in the affairs of another and who with respect to the physical conduct in the performance of the services is subject to the other's control or right to control.
 (2) In determining whether one acting for another is a servant or an independent contractor, the following matters of fact among others, are considered.
 (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
 (b) whether or not the one employed is engaged in a distinct occupation or business;
 (c) the kind of occupation with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
 (d) the skill required in the particular occupation;
 (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
 (f) the length of time for which the person is employed;
 (g) the method of payment, whether by the time or by the job;
 (h) whether or not the work is a part of the regular business of the employer;
 (i) whether or not the parties believe they are creating the relation of master and servant; and
 (j) whether the principal is or is not in business.
 
 
 [1]
 But see discussion, infra, concerning the difficulties encountered when one attempts to apply the "agency" right of control liability test in a mechanical fashion where the question is whether an individual is or is not an "employee" under the N.L.R.A
 
 
 [2]
 See generally W. Prosser, Handbook of the Law of Torts, ch. 13 (3rd ed. 1964); W. Seavy, Handbook of the Law of Agency, Secs. 1-3 (1964)
 
 
 [3]
 I do not, of course, venture any opinion whatsoever concerning the liability of the general contractors for injuries caused by the owner-operators
 
 
 [4]
 Indeed, the entire thrust of the Act is the bringing together of employee and employer so that disputes may be resolved in an amicable fashion. The agreements which result from such resolutions are "an effort to erect a system of industrial self-government. * * * The mature labor agreement may attempt to regulate all aspects of the complicated relationship, from the most crucial to the most minute over an extended period of time." United Steelworkers of America v. Warrior & Gulf Nav. Co., 363 U.S. 574, 580, 80 S.Ct. 1347, 1352, 4 L.Ed.2d 1409 (1960). The scope of the Act, therefore, must be determined in light of the fact that control over performance of work is only one facet of the relationship with which the Act and its intended products deal
 
 
 [5]
 This analysis does not depart from that utilized by the Supreme Court in N.L.R.B. v. United Ins. Co., 390 U.S. 254, 258-259, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968). Most of the "decisive" factors therein discussed were factors other than control by the employer of the details of work performed by the employee in question