BUILDING MATERIAL & CONSTRUCTION TEAMSTERS UNION LOCAL NO. 216, INTERNATIONAL BROTHERHOOD OF TEAMSTERS, CHAUFFEURS, WAREHOUSEMEN, & HELPERS OF AMERICA, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent,

and

Bigge Drayage Company, Intervenor.

BIGGE DRAYAGE COMPANY, Petitioner,

v.

NATIONAL LABOR RELATIONS BOARD, Respondent.

Nos. 72–2008, 72–2098.

United States Court of Appeals, District of Columbia Circuit.

Argued Jan. 17, 1974.

Decided Sept. 29, 1975.

Duane B. Beeson, San Francisco, Cal., of the bar of the Supreme Court of California, pro hac vice, by special leave of court, with whom Angelo V. Arcadipane, Washington, D. C., was on the brief, for petitioner in No. 72–2008.

Robert M. Lieber, Washington, D. C., with whom Wesley J. Fastiff, San Francisco, Cal., was on the brief, for petitioner in No. 72–2098. George J. Tichy, Spokane, Wash., also entered an appearance for petitioner in No. 72–2098 and intervenor in No. 72–2008.

Joseph E. Mayer, Atty., N. L. R. B., with whom John S. Irving, Deputy Gen. Counsel, Patrick Hardin, Associate Gen. Counsel and Elliott Moore, Asst. Gen.

Counsel, N. L. R. B., were on the brief, for respondent.

Before McGOWAN and ROBB, Circuit Judges, and MATTHEWS,* United States Senior District Judge, United States District Court for the District of Columbia.

Opinion for the Court filed by Circuit Judge McGOWAN.

McGOWAN, Circuit Judge:

This case arises on cross-petitions for review of the resolution by the National Labor Relations Board of complaints filed by Bigge Drayage Company against Building Materials & Construction Teamsters Union, Local No. 216, alleging violations of Sections 8(e) and 8(b)(4)(ii)(D) of the National Labor Relations Act. 29 U.S.C. §§ 158(b)(4)(ii)(D), (e). The Board found that the contract provisions challenged in the Section 8(e) allegation were valid on their face but invalid as applied, and that the Union's actions constituted a violation of 8(b)(4)(ii)(D). For the reasons stated hereinafter, we affirm the Board's decision on both charges.[1]

I

A. *The Parties.*

Bigge Drayage Company ("Bigge Drayage"), petitioner in No. 72–2098 and intervenor in No. 72–2008, is composed of several divisions, including Bigge Crane & Rigging Company ("Bigge Crane") and the Trucking Division of Bigge Drayage Company ("Bigge Trucking").[2] The Trial Examiner and the Board found, and the Union does not contest, that Bigge Crane and Bigge Trucking are separate "persons" for the purpose of the Act. (A. 578).

Bigge Crane is engaged in the business of renting cranes, installing and moving machinery, and performing heavy rigging and precast erection work (A. 142–43). With the exception of two trucks that haul crane components and tools to and from job sites, Bigge Crane owns no over-the-road surface trucking units such as those operated by Bigge Trucking (A. 144–45, 153–54). Bigge Crane is a member of the Associated General Contractors of America ("AGC"), and, through that group, is a party to a collective bargaining agreement (the "AGC Agreement") with a number of Construction Teamsters unions, including Local 216.

Bigge Trucking is engaged exclusively in over-the-road transportation of large and heavy items for and related to the construction industry. It performs specialized heavy-load hauling services, such as the transportation of concrete girders weighing as much as 100 tons and measuring as much as 150 feet long (A. 119–20, 204–208). This type of hauling requires special equipment and specialized training (A. 204–208). Bigge Trucking is a member of an employers' group known as the California Trucking Association ("CTA"), and is, through it, signatory to a bargaining agreement (the "CTA Agreement") with a number of Teamster locals representing over-the-road long haul and local pick-up-and-delivery drivers. Locals 70 of Oakland, 85 of San Francisco, and 315 of Richmond are all parties to the CTA agreement.

B. *The Bargaining Contracts.*

The AGC Agreement between Bigge Crane and Local 216 provided in part:

### Section 30—SUBCONTRACTING

\* \* \* \* \* \*

C. The Employer further agrees that when subcontracting work covered by this Agreement which is to be

---

* Sitting by designation pursuant to Title 28, U. S. Code Section 294(c).

1. After oral argument before a division of this court, disposition was deferred pending decision by the Court en banc of No. 73–1764, *Enterprise Association v. NLRB,* 172 U.S.App. D.C. ——, 521 F.2d 885 (decided July 1, 1975).

2. The Trucking Division was often referred to in the trade as Bigge Drayage (A. 286). Any confusion this may have caused in the minds of the Union's representatives, however, was cleared up by repeated explanations. *See* 171 U.S.App.D.C. ——, pp. ———, 520 F.2d 172, pp. 176–177, *infra.*

performed within the geographical area covered by this Agreement but which is not to be performed at the site of the construction, alteration, painting or repair of the building, road or other work, he will subcontract such work only to an Employer or person who agrees that the persons performing such work will work in accordance with the schedule of hours and will receive not less than the wages and economic benefits provided in this Agreement including holidays, vacations, premiums, overtime, health and welfare and pension contributions or benefits or their equivalent and any other programs or contributions or benefits or their equivalent and any other programs or contributions required by this Agreement and who further agrees to submit any grievance or disputes concerning his performance or compliance with such undertaking to the procedures set forth in Section 15 of this Agreement.

As to any Employer who has always subcontracted work involving certain equipment, this paragraph shall not become applicable with respect to work involving such equipment if its validity is challenged by charges filed by the National Labor Relations Board until determination by the National Labor Relations Board or if not by the National Labor Relations Board, by a Court of Competent jurisdiction that the provisions are not in violation of the National Labor Relations Act.

D. The Employer will give written notice to the Union of any subcontract involving the performance of work covered by this Agreement within five (5) days of entering into such subcontract and shall specify the name and address of the subcontractor. Any Employer who gives such notice and requires the subcontractor to agree to comply with and observe the provisions of Subsection C hereof with respect to work performed other than at the job site shall not be liable for any delinquency by such subcontractor in the payment of any wages, fringe benefits or contributions provided herein except as provided hereinafter.

The Section 15 referred to in the foregoing paragraph (C) provided a grievance-arbitration procedure for resolving all disputes arising under the Agreement. Excluded from such disputes, however, were jurisdictional conflicts governed by Section 20 of the AGC Agreement which provides as follows:

### JURISDICTIONAL DISPUTE

There shall be no cessation of or interference in the work of an Employer by reason of a jurisdictional dispute between the Union and a Union affiliated with the AFL–CIO. Such disputes shall be settled directly between the International Brotherhood of Teamsters, Chauffeurs, Warehousemen & Helpers of America, and the Union involved.

The CTA Agreement between Bigge Trucking and Locals 70, 85, and 315 (through the Hauling Teamsters) had a similar provision on resolution of jurisdictional disputes:

ARTICLE 30—Jurisdictional Disputes

In the event that any dispute should arise between any Local Unions, parties to this Agreement, Supplements or Riders thereto or between any local Union, party to this Agreement, Supplements or Riders thereto and any other Union, relating to jurisdiction over employees or operations covered by such Agreements, the Employer and the Local Unions agree to accept and comply with the decision of settlement of the Unions or Union bodies which have the authority to determine such dispute, and such disputes shall not be submitted to arbitration under this Agreement, Supplement, or Riders thereto.

C. *The Charges.*

The charges arose out of events involving work performed on two separate construction jobs: the Bay Area Rapid Transit (BART) job and the "China Basin" highway construction job.

### 1. *The BART Job.*

Hensel Phelps Construction Company, the general contractor on the BART project, subcontracted the manufacture, transportation, and erection of pre-stressed concrete girders to Castcon, Inc., a company engaged in the manufacture of such girders (J.A. 570; 68, 99, 115) Castcon in turn subcontracted the transportation and erection of the girders to Bigge Crane (J.A. 571; 116, 143, 146) which, as has been noted, was equipped to erect, but not to transport, the girders. Bigge Crane therefore subcontracted the transportation of the girders to Bigge Trucking (J.A. 571; 99, 223).

Castcon transported the girders, which were approximately 70 feet in length and weighed as much as 100 tons (J.A. 570–71; 117), from its plant in Richmond, California, to Pier 42 in San Francisco. Bigge Trucking transported the girders from Pier 42 to the BART job site. Due to the size of the girders, special equipment was necessary, consisting of a pilot truck, two heavy duty tractors pulling a double gooseneck trailer, a tiller unit manned by a tiller man, and a rear escort truck (J.A. 119–20, 205–06, 215–19, 225–28). A composite crew of members of Locals 70 and 85 were used on this job (J.A. 119, 222, 458).

### 2. *The China Basin Job.*

The China Basin project was similar in most respects, the major differences being that the general contractor was Caputo Construction Company and that some of the girders could be hauled directly from Castcon's plant on equipment that did not require a tiller man while other girders, which were up to 145 feet long, not only were barged but also required that Bigge Trucking design and build a special piece of equipment for their transportation (J.A. 118–20, 225–27).

### D. *The Events Leading up to the Charges.*

The Hearing Examiner and the Board found, and the Union does not dispute, the facts leading up to and subsequent to the charges. In December, 1969, Dallas Craig, president and business agent of Local 216 (the union representing the employees of Bigge Crane), learned that Bigge Trucking was transporting girders in San Francisco from Pier 42 to the BART project. On December 14, he telephoned Glen Holtwick, Assistant Manager of Bigge Trucking, and told him that he believed that Bigge Trucking was in violation of the AGC Agreement, and that if the men of Locals 70 and 85 who were doing the work were not replaced with members of Local 216 by 8 o'clock the next morning, Craig would have to picket the pier.

Holtwick replied that he did not know that his company had a contract with Local 216, and explained that both Bigge Crane and Bigge Trucking were involved in this project. He asked Craig to postpone picketing or the taking of any action until he returned to his office, and to notify Holtwick before any picketing was instituted. Craig agreed to do so, and telephoned a representative of CTA who agreed to look into the matter.

On December 29, Craig filed grievances under the terms of the AGC Agreement against Bigge Crane and Hensel Phelps, alleging violations of the subcontracting clause. He sought as relief "payment under AGC scale and fringe benefits for the top men on Teamsters Local 216 out-of-work list for each Teamster employed by Bigge Drayage and every hour each man worked according to Bigge Drayage payroll records."

On January 14, 1970, Bigge Drayage filed a charge that Local 216 was violating Section 8(e) of the NLRA.[3] On Feb-

---

**3.** Section 8(e) provides in relevant part:

It shall be an unfair labor practice for any labor organization and any employer to enter into any contract or agreement, express or implied, whereby such employer ceases or refrains or agrees to cease or refrain from handling, using, selling, transporting or otherwise dealing in any of the products of any other employer, or to cease doing business with any other person, and any contract or agreement entered into heretofore or hereafter containing such an agreement shall be to such extent unenforcible and void . . . . .

ruary 16, the grievance meeting was held to determine the AGC grievance filed by Craig. At that meeting, Craig reiterated that if Bigge Trucking attempted to bring the girders in from Pier 42 without compliance with the AGC Agreement, Local 216 would picket the pier. Holtwick stated that he had no knowledge of any contract with Local 216 and was operating (on behalf of Bigge Trucking) within the framework of the CTA Agreement. The Board of Adjustment hearing the dispute decided to defer resolution pending the NLRB's decision of the pending 8(e) charge.

On February 26, Bigge Drayage filed an 8(b)(4)(ii)(D) charge against Local 216.[4] As reflected in the complaint before the Board, this charge covered threats against Bigge Trucking, Bigge Crane, Bigge Drayage, Hensel Phelps, Castcon, and Caputo. (J.A. XI).

On March 17, Craig advised Donald Jeffers, a director of labor relations for AGC, that Bigge Company had a contract to haul girders to the China Basin project, and if they attempted to move girders from the pier to the project, Local 216 would strike them. Jeffers stated that Bigge Crane was a division of Bigge Drayage Company and was separate from the drayage [Trucking] division.

On April 10, Craig called Jeffers and informed him that if anyone hauled the disputed girders with trucks not driven by members of Local 216, Craig was going to strike the China Basin job. On the same morning, Craig also called George Williams, Manager of Castcon,

and told him that Local 216 had a difference of opinion with Bigge in regard to the transportation of the structural girders. He asked that Castcon use its influence or advise Bigge that it was a serious situation and should be resolved. Williams asked Craig what would happen if the controversy were not resolved, and Craig replied that "in the event they were to unload the sections in San Francisco by barge, that we would probably have to strike them."[5]

II

Bigge Drayage challenges the Board's determination that Section 30(C) and (D) of the AGC Agreement is on its face a lawful union standards clause. Bigge Drayage asserts that Section 30(C) and (D) entirely fails to qualify for the "work preservation" exception to the prohibitions of 8(e), see *National Woodwork Manufacturers Ass'n v. N.L.R.B.,* 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967); *Retail Clerks Union Local 1288 v. N.L.R.B.,* 129 U.S.App.D.C. 92, 390 F.2d 858 (1968); *Meat and Highway Drivers, Local 710 v. N.L.R.B.,* 118 U.S. App.D.C. 287, 335 F.2d 709 (1964), because (1) it is not directed to preservation or recapture of unit work; and (2) because it seeks to impose non-economic conditions on subcontracting.

The clauses in question are susceptible of the reading that Bigge Drayage seeks to impose on them. But they are equally, or more susceptible, however, to the interpretation that they cover only unit work and only economic benefits.

■ The sole factual indication that clause (C) might have been intended to

---

4. Section 8(b)(4) provides in relevant part:

It shall be an unfair labor practice for a labor organization or its agents . . . (ii) to threaten, coerce, or restrain any person engaged in commerce or in an industry affecting commerce, where . . . an object thereof is . . . (D) forcing or requiring any employer to assign particular work to employees in a particular labor organization or in a particular trade, craft, or class rather than to employees in another labor organization or in another trade, craft, or class, unless such employer is failing to conform to an order or certification of the

Board determining the bargaining representative for employees performing such work . . . .

5. Craig testified that the "them" in his statement referred to Bigge rather than to Castcon (which owned or rented the crane that did the actual unloading). The Hearing Examiner and Board found that "Craig did not so delineate the area and object of his threatened picketing and that the normal import of the words used was that the operation of the transfer of the girders from the barge to Bigge's trucks would be picketed." We agree.

cover non-unit work is the Union's actions in the instant case. Those actions were the basis for the Board's holding that the clause was illegal *as applied.* In these circumstances we believe that the Board was correct in following its policy that "where the clause is not clearly unlawful on its face, the Board will interpret it to require no more than what is allowed by law." *General Teamsters, Local 982,* 181 NLRB 515, 517 (1970), *enf'd sub nom., Joint Council of Teamsters No. 42 v. N.L.R.B.,* 146 U.S.App. D.C. 275, 450 F.2d 1322 (1971).

Bigge Drayage argues that the testimony of Dallas Craig shows that the Union intended the subcontracting clauses to impose on the subcontractor all of the non-economic aspects of the AGC Agreement. Indeed, Dallas Craig did insist that in the instant dispute he expected such things as a prejob conference and payments to the union welfare fund (J.A. 435, 438, 506, 509). It is clear from the record, however, that this expectation was based on the belief that he was dealing with an employer who was a party to the AGC Agreement. Near the close of his testimony, Craig was asked:

> All of the answers to the questions of the Trial Examiner you have been giving with respect to the Bigge situation, I take it, Mr. Craig, and correct me if I am wrong, were on the assumption Bigge Trucking was a party to the AGC contract?

To which Craig responded "Yes."

As the Trial Examiner attempted further to clear up the confusion, the following discussion took place:

6. The Board's findings and reasoning were as follows:

> Under AGC contracts, [Local 216] has represented drivers in the construction industry for many years. The work of these drivers consists generally of hauling dirt, rock, and debris, asphalt, and other materials and supplies. None of the employer-parties to the contract ever hauled pre-stressed concrete girders. Indeed, none of them have the necessary equipment for such work. Though the contract's coverage was extended in 1968 to embrace classifications which are described to perform this work, to which the

> Trial Examiner: [If the subcontractor was not a party to the AGC Agreement] Then he would have, that five and five business would apply to him?
>
> A. No; no, it would have no application at all. He doesn't have a contract. He is not entitled to the agreement.
>
> Q. I thought he came under the agreement with the general contractor?
>
> A. If he is a subcontractor, a signed subcontractor with the prime contractor, then he is covered by this agreement to the extent the subcontract covers hours, wages, working conditions and fringe benefits.

(J.A. 512)

We believe this shows that Craig was confused about the situation he was dealing with, but not about the meaning of Section 30(C) and (D). We note also that the Board's action in preserving the clause by noting that it applies only where legal is in accord with our express policy of not rewriting bargaining agreements. *See Local 98, Sheet Metal Wkrs. Int'l Ass'n v. N.L.R.B.,* 140 U.S.App.D.C. 83, 433 F.2d 1189, 1195–96 (1970). We therefore affirm the Board's finding that Section 30(C) and (D) of the AGC Agreement is not on its face violative of Section 8(e) of the Act.

Local 216 challenges the Board's finding that Sections 30(C) and (D) are invalid under Section 8(e) insofar as it is claimed to cover the work of hauling heavy pre-stressed concrete girders.[6]

> subcontracting provisions of the contract noted above was to become applicable, it does not appear that the classifications were included in anticipation of the AGC members undertaking the work. As already indicated, they never did.
>
> The disputed hauling work continued to be performed, as it was theretofore, by employers who were members of the California Trucking Association and who employed members of Teamsters Locals 70 and 85. However, subsequent to the addition of the above-mentioned hauling classifications of the AGC contract, [Local 216] sought to ac-

The Board based its finding on the fact that Bigge Crane has never done the claimed work and, indeed, it has not been and is not now equipped to handle such work. The Board noted that the AGC Agreement provides job classifications for persons doing such work, but properly recognizes that the mere existence of the classifications does not make the work "of a type which the men in the bargaining unit have the skills and experience to do." *Meat and Highway Drivers, Local 710 v. N.L.R.B.,* 118 U.S. App.D.C. 287, 335 F.2d 709, 714 (1964).

Local 216's major argument supporting its assertion that this work is unit work for Bigge Crane rests on an agreement entered into by an employer called Owl Truck Company.[7] Owl Truck Company is affiliated with Owl Constructors (in a construction-hauling arrangement very like Bigge Trucking and Bigge Crane). Owl Truck is based in Southern California, and its employees are represented by Teamsters Local 692. There is nothing in the record indicating what union represented Owl Constructors. When Owl Trucking received a certain hauling subcontract from Owl Constructors, it entered into an agreement with Teamsters Local 315 of Richmond, a signatory to both the AGC and CTA Agreements, that it would employ a certain number of Local 315 members and pay them according to the AGC scale. The agreement specifically provided that "No

precedent is set by this agreement and it applies only to this job consisting of 158 girders." (J.A. 528).

■ Even assuming that the "no precedent" clause had not been included, we fail to perceive how the willingness of Owl Truck Company to pay AGC wages to members of Local 315 makes either Owl Constructors or Bigge Crane more able to perform the hauling work which they are not equipped to do and which they have never done in the past, or constitutes any sort of admission as to the scope of unit work. The Board's finding that the hauling of pre-stressed concrete girders is not unit work for Bigge Crane is clearly supported by substantial evidence, and nothing raised by Local 216 creates any doubt in our minds as to the correctness of that finding.

### III

■ The 8(b)(4)(ii)(D) charge in this case has two elements. First, the Board found that Local 216 threatened, coerced, or restrained employers (Bigge Trucking, Hensel Phelps, and Castcon, J.A. 581) with which it did not have a bargaining relationship and which did have a bargaining relationship with other unions, for the purpose of requiring those employers to employ the members of Local 216 or pay wages equal to those obtained by Local 216 from its employer.[8] The Union does not assert

---

quire such work for its members, claiming entitlement to it under the AGC contract. It also sought to impose the obligations of the subcontracting provisions upon the subcontractor who performed this work.

It thus appears that [Local 216] has entered into a contract which, insofar as the work of hauling pre-stressed concrete girders is concerned, limits subcontracting to those employers who would observe section 30(C) and (D). Since employers who are parties to the AGC contract were not engaged in this type of hauling, nor are shown even to have anticipated its performance, the object of this restriction was not the preservation or protection of unit work. If it served no primary purpose, it is only reasonable to conclude that its aim was a secondary one, as this record amply demonstrates. To the extent noted, therefore, a

majority of the Board (Chairman Miller and Members Kennedy and Penello) finds an 8(e) violation. (J.A. 559–61) [footnotes omitted].

7. In citing the Owl experience for support, the Union argues that the definition of unit work should be derived from the multi-employer bargaining unit consisting of the California chapters of the Associated General Contractors. Because we find that even using such an approach, the Union's view of unit work is unsupportable, we need not rule on the propriety of the approach itself.

8. The Union contends that the Board should have deferred to the grievance procedures of the AGC Agreement for resolution of the question of "whether Crane & Rigging and Bigge Trucking constituted a single employer." (Br. of Local 216, at 24). This argument was not, however, raised before the Board and, as pro-

that any of these companies is obligated to bargain with or to assign this work to Local 216, but rather states that it is merely enforcing its subcontracting agreement with Bigge Crane.

■ One might have expected the Board to proceed on this first element under 8(b)(4)(B), as that is the section primarily concerned with actions taken against neutral secondary employers. As the Supreme Court recognized in a virtually identical case, however, the type of activity here engaged in constitutes a violation of both 8(b)(4)(B) and 8(b)(4)(ii)(D), *N.L.R.B. v. Local 825, International Union of Operating Engineers,* 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971); *see N.L.R.B. v. Local 282, Int'l Broth. of Teamsters,* 344 F.2d 649 (2nd Cir. 1965) and the Board's use of Section 8(b)(4)(ii)(D) was therefore not improper.[9]

■ The second element consisted of the threats against Bigge Crane. If that action was to enforce a subcontracting clause protecting unit work, such action would, without more, be clearly legal. *See Enterprise Ass'n, Local 638 v. N.L.R.B.,* No. 73–1764, 172 U.S.App.D.C. ——, 521 F.2d 885, decided July 1, 1975; *Meat & Highway Drivers, Local 710 v. N.L.R.B.,* 118 U.S.App.D.C. 287, 335 F.2d 709, 713–14 (1964); *Retail Clerks Local 770 v. N.L.R.B.,* 111 U.S.App.D.C. 246, 296 F.2d 368, 372–73 (1961). Since as we have heretofore noted, the work clearly was not unit work, the threats were in fact to force Bigge Crane to bring pressure on Bigge Trucking to employ members of Local 216 or to pay AGC scale wages. As in the case of the other employers, this situation would seem to be most appropriately dealt with under Section 8(b)(4)(B). *See Orange Belt District Council of Painters No. 48 v. N.L.R.B.,* 117 U.S.App.D.C. 233, 328 F.2d 534 (1964); *Building and Construction Trades Council v. N.L.R.B.,* 117 U.S.App.D.C. 239, 328 F.2d 540 (1964). The holding of *N.L.R.B. v. Local 825, International Union of Operating Engineers* would seem, however, also to cover the actions taken against Bigge Crane. Further, insofar as the Union does not challenge the applicability of Section 8(b)(4)(ii)(D) to any of its actions, we understand its applicability to be conceded.

Having decided to proceed entirely under 8(b)(4)(ii)(D), the Board is bound by the restrictions that the Act places on that Section. Section 10(k) provides:

> Whenever it is charged that any person has engaged in an unfair labor practice within the meaning of paragraph (4)(D) of Section 8(b), the Board is empowered and directed to hear and determine the dispute out of which such unfair labor practice shall have arisen, unless, within ten days after notice that such charge has been filed, the parties to such dispute submit to the Board satisfactory evidence that they have adjusted, or agreed upon methods for the voluntary adjustment of, the dispute. Upon compliance by the parties to the dispute with the decision of the Board or upon such voluntary adjustment of the dispute, such charge shall be dismissed.

In the instant case, the Board found, and no party disputes, that Section 20 of the AGC Agreement dovetails with Article 30 of the CTA Agreement to provide

vided by Section 10(e) of the Act, may be raised before this court only if the failure below was excused because of "extraordinary circumstances." The only extraordinary circumstance urged by the Union is the advent of the Board's decision in Collyer Insulated Wire, 192 NLRB No. 150, 77 LRRM 1931 (1971), which announced a policy of deference to grievance arbitration for certain questions. Without deciding whether *Collyer Wire* would be applicable to this case (we have some doubts thereon because no grievance procedure existed between Local 216 and Bigge Trucking), we note that the Board's decision in that case came a year prior to its decision in the instant case. We therefore find that the advent of *Collyer Wire* does not constitute an "extraordinary circumstance" sufficient to justify raising the question here.

9. This choice was perhaps motivated by a desire to cover the possibility that Bigge Crane and Bigge Trucking would be found to be the same employer.

a method of resolving the dispute. On September 17 and 18, 1970, Locals 216, 70, and 85 executed a Memorandum of Understanding that provided in pertinent part:

> Construction Teamsters Local 216 does not claim the work of hauling concrete pre-stressed girders over public highways for delivery to construction sites where such work is performed by Bigge Drayage Company and is assigned to employees of, or represented by, Teamsters Local 70 or Local 85. Construction Teamsters Local 216 agrees that employees of Bigge Drayage Company who are members of, or represented by, Teamsters Local 70 or 85 are assigned, and are entitled to perform the work described above for Bigge Drayage Company.

 The Union contends that the existence of this agreement requires the Board, under 10(k), to dismiss the 8(b)(4)(D) charge. The Board responds that the agreement did not provide an actual adjustment of the dispute. We agree with the Board. The agreement appears to provide that where the work in question is subcontracted to Bigge Trucking,[10] Locals 70 and 85 shall represent the workers. Nevertheless, Dallas Craig continued to maintain that, even though members of Locals 70 and 85

10. The use of Bigge Drayage is somewhat confusing, but the agreement clearly applies to the particular dispute at hand.

11. No party raises the question whether the Board's order goes beyond the terms of the (ineffective) agreement, and whether such an extension is proper in the absence of a 10(k) hearing. *Compare* 29 C.F.R. § 102.93; *Operating Engineers Local No. 3,* 192 NLRB No. 28, 77 LRRM 1864 (1971); *Electrical Workers Local 26,* 147 NLRB 1498, 1502 (1964); and

would perform the work, they should be paid at the Local 216 scale (J.A. 473–85, 479–80, 485). This clearly is a refusal to comply with the voluntary agreement. As the Supreme Court said in *N.L.R.B. v. Plasterers' Union,* 404 U.S. 116, 135, 92 S.Ct. 360, 372, 30 L.Ed.2d 312 (1971):

> [T]he Board does not apply the Safeway rule [on dismissal, announced in *Highway Truckdrivers, Local 107,* 134 N.L.R.B. 1320 (1961)] to unimplemented agreements to arbitrate between the unions alone, and it does not consider it applicable where employees continue on the job after their international union loses an arbitration proceeding and renounces the work. *These de facto disputes are real, and they deserve Board resolution if the purposes of § 10(k) are to be achieved.* [footnote omitted] (emphasis added).

We therefore hold that the Board was correct in refusing to dismiss the charges and proceeding to a consideration of whether a violation had taken place. Local 216 raises no other objections to the finding of an 8(b)(4)(ii)(D) violation.[11]

We therefore affirm the Board's ruling on the 8(e) and the 8(b)(4)(ii)(D) charges, and the order entered to remedy those violations.

*It is so ordered.*

*Wood, Wire and Metal Lathers Int'l,* 119 NLRB 1345 (1958) *with N.L.R.B. v. Local 825, Int'l Union of Operating Engineers,* 410 F.2d 5, 9 (3rd Cir. 1969), *reversed in part in other respects,* 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). This case is somewhat special, however, in that all of the elements of the order are independently justified by the findings relating to the 8(e) violation, in particular the finding that the hauling was not unit work, which we here uphold.