**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**PEPSI COLA BOTTLING COMPANY OF MANSFIELD, OHIO, Respondent.**

No. 71-1266.

United States Court of Appeals, Sixth Circuit.

Feb. 14, 1972.

Arthur Fox, II, N.L.R.B., Washington, D. C., for petitioner; Eugene G. Goslee, Acting Gen. Counsel, Dominick L. Manoli, Associate Gen. Counsel, Marcel Mallet-Prevost, Asst. Gen. Counsel, Allison W. Brown, Jr., Atty., N.L.R.B., Washington, D. C., on brief.

William A. Busemeyer, Cincinnati, Ohio, for respondent; Lindhorst & Dreidame, Cincinnati, Ohio, on brief.

Before PHILLIPS, Chief Judge, WEICK, Circuit Judge, and ROTH, District Judge.*

ROTH, District Judge.

This is an unfair labor practice proceeding under the National Labor Relations Act, as amended, commenced by a

---

* The Honorable Stephen J. Roth, Judge, United States District Court for the Eastern District of Michigan, sitting by designation.

charge filed by the International Union of United Brewery, Flour, Cereal, Soft Drink and Distillery Workers of America, AFL–CIO (hereafter "Union") against Pepsi Cola Bottling Company of Mansfield, Ohio (hereafter "Company"), a division of the Burger Brewing Company, alleging that the Company had committed acts constituting unfair labor practices under the Act. The case is before the court upon the application of the National Labor Relations Board (hereafter "Board"), pursuant to Section 10(e) of the Act, 29 U.S.C.A. Sec. 151 et seq., for enforcement of its order to "cease and desist" and to affirmatively engage in bargaining with the Union.

The Union filed a representation petition with the Board pursuant to Section 9(c) of the Act on February 4, 1969 requesting certification as the bargaining representative for a unit consisting of the Company's "driver-sales distributors." At the hearing on the petition the Company took the position that the distributors were "independent contractors" and not "employees" within the meaning of Section 2(3) of the Act. The regional director, with the Board's concurrence, rejected the contention of the Company; a Board-ordered election was held; and the Union won. The Company thereafter refused to bargain with the Union, adhering to its position that the distributors were independent contractors. The regional director's decision [1] describes in detail the relationship between the distributors and the Company.

Two questions are presented for our resolution. First, whether the Company has been deprived of procedural due process under Section 10 of the Act and Sections 5, 7, 8 and 11 of the Administrative Procedure Act and, if not, whether substantial evidence on the record as a whole supports the Board's determination that the "driver-sales distributors" are "employees" and not "independent contractors" for the purposes of collective bargaining.

■ As to the first question the Company takes the position that at the hearing on the charge of unfair labor practice for refusal to bargain before the hearing examiner it was entitled to a hearing on the issue of whether the distributors were independent contractors, although it admitted that it had no newly discovered evidence to offer. The trial examiner took the opposite view and granted the motion of the general counsel for summary judgment. The Board upheld this ruling and found that the Company's refusal to bargain violated Section 8(a) (5) and (1) of the Act. The position of the Company on this question might plausibly have had some substance at the time it was first asserted, but all question of the propriety of the course pursued in these proceedings has since been removed by the ruling of the Supreme Court in Magnesium Casting Company v. NLRB, 401 U.S. 137, 91 S.Ct. 599, 27 L.Ed.2d 735, decided February 23, 1971. In speaking of the 1959 amendment [2] the Court said:

> "Whatever the reason for the delegation, Congress has made a clear choice; and the fact that the Board has only discretionary review of the determination of the regional director creates no possible infirmity within the range of our imagination."

> " * * * For it is unmistakably plain here that by § 3(b) Congress did allow the Board to make a delegation of its authority over determination of the appropriate bargaining unit to the regional director." (p. 142, 91 S.Ct. p. 602).

See, also, NLRB v. Brush-Moore Newspapers, Inc., 413 F.2d, 809, 811 (6th Cir. 1969):

> " * * * Furthermore, it also clear that the Board is not required to grant a hearing to reconsider factual

---

1. See Appendix.

2. Section 3(b) of the National Labor Relations Act, as amended, 61 Stat. 139, 73 Stat. 542, 29 U.S.C.A. § 153(b).

issues resolved at an earlier, related representation hearing unless newly discovered or previously unavailable evidence is presented."

The Supreme Court recently (Dec. 14, 1971) denied certiorari in a Second Circuit case, Herald Company v. NLRB, 444 F.2d 430 (1971) where one of the issues raised was the Board's denial of the Company's motion to reopen the representation hearing for reconsideration of the regional director's finding that the distributors there involved were employees under the Act.

The second question requires consideration of the evidence supporting the Board's finding that the distributors are employees and not independent contractors. Common law agency principles are controlling, NLRB v. United Insurance Co., 390 U.S. 254, 256, 88 S.Ct. 988, 990, 19 L.Ed.2d 1083:

> "Thus there is no doubt that we should apply the common-law agency test here in distinguishing an employee from an independent contractor."

And *United Insurance* instructs further (p. 258, 88 S.Ct. p. 991) that

> " * * * In such a situation as this there is no shorthand formula or magic phrase that can be applied to find the answer but all of the incidents of the relationship must be assessed and weighed with no one factor being decisive. What is important is that the total factual context is assessed in light of the pertinent common-law agency principles."

Keeping these principles in mind we have examined the record in this case, and without cataloging all aspects and facets of the relationship between Company and the distributors which have some bearing on its nature and characterization, we find that the Board's finding is supported by substantial evidence. We concede that there are indicia present, which, generally, are associated with the independent contractor status, but the most that can be said for them is that the Board was presented with a choice between two fairly conflicting views.[3] Under NLRB v. United Insurance Co., *supra*, that leaves this court with no choice but to authorize the entry of a decree enforcing the order of the Board. Accordingly, a decree enforcing the order of the Board will be entered.

## APPENDIX

The Employer through a franchise agreement, is engaged in the bottling and distribution of Pepsi-Cola's soft drink products in nine Ohio counties. Its headquarters bottling plant and main warehouse are located at Mansfield, Ohio, where all manufacturing processes are performed. In addition, the Employer maintains warehouses at Marion and Mt. Vernon, Ohio. Approximately 30 distributors service the Employer's geographic territory, with 20 stationed at Mansfield, 8 at Marion and 2 at Mt. Vernon. All 30 distributors are being sought by the Petitioner.

According to the Employer, its sales staff consists of a sales manager and five route managers. None of these individuals is sought by the Petitioner.

The distributors are assigned to sell and deliver the Employer's soft drinks

---

3. For an illustration of how close the "conflicting views" may be and still prevail under attack in the courts, see NLRB v. Checker Cab Co., 367 F.2d 692, CCA 6 (1966), where the Board split 3 to 2 in favor of the order to bargain. There the resolution of the issue was complicated by the fact that the "company" was a conglomerate of 286 owners of the Checker cabs, with 900 cabs, driven by 7,000 full-time and part-time drivers. The court said (page 698):

> "In this case, a group of employers have banded together so as to set up joint machinery for hiring employees, for establishing working rules for employees, for giving operating instructions to employees, for disciplining employees for violation of rules, for disciplining employees for violation of safety regulations. These facts we believe to be 'sufficient indicia of control' to warrant the joint employer finding of the Board."

to various retail establishments on specified routes. In fulfilling their obligations they arrange for the proper display of the products by retail stores for sale to the public. The distributors primarily use trucks which are equipped with a "beverage" body and are purchased from the Employer. In addition, each distributor owns one or more hand carts or "dollies" for transporting the product from the truck into the customer's store. These items are financed through a bank by the distributor upon his initial association with the Employer.

All the distributors are required to sign an agreement which states as follows:

"1. In the event the Driver-Owner should desire to terminate his business relationship with the Company he shall give to the Company at its Mansfield address, twenty-one (21) days written notice of his intention to terminate said relationship and in said written notice he shall state the price he is willing to accept from a potential buyer for said equipment.

"2. Thereafter, the Company shall within two (2) days of the receipt of said written notice either approve said price as stated in said notice or arrange a meeting with said Driver-Owner to negotiate the fair market value of said equipment which is to be in a sale by Driver-Owner to a potential buyer.

"3. In the event the parties can not agree upon the price for said equipment within three (3) days after said meeting, each party shall appoint an appraiser and the two appraisers so appointed shall select a third person to appraise said equipment and said appraisers shall within ten (10) days of their appointment make an award in writing as to their opinion of the fair market value of the truck, cab and chassis belonging to the Driver-Owner and said award shall be final and binding upon the parties hereto.

"4. The body on the beverage truck in computing its value shall be depreciated straight line on a ten (10) year basis to establish the selling price of said body. All working parts must be in good operating condition, paint in a presentable condition and in the event said working parts need repairs or said body needs repainting the cost shall be shared equally between the Driver-Owner and the purchaser.

In the event there is a dispute between the Driver-Owner and the Company the question as to whether said working parts need repairs or said body needs repainting, will be submitted to the appraisers selected above.

"5. If a sale of the equipment has not been consummated by the 21st day after notification by the Driver-Owner, the Company will operate the Driver-Owner route truck until a purchaser for the equipment is located.

"6. During the period the Company operates the Driver-Owner's truck route, the Company will pay to the Driver-Owner (or the mortgagee if said equipment is mortgaged) for the use of said equipment, nine (9) cents per case of beverage sold during the period of operation by the Company and the Company in addition will furnish all gasoline and oil required to operate said equipment and pay all repairs up to One Hundred ($100.00) Dollars, and any major repairs costing in excess of One Hundred ($100.00) Dollars for the first thirty (30) days of operation by the Company will be shared equally by the Company and the Driver-Owner. Any repairs occurring after the

first thirty (30) days of operation by the Company will be paid entirely by said Company. Any damages to the equipment shall be covered by the Driver-Owner's collision insurance policy; save and except the first One Hundred ($100.00) Dollars which will be paid by the Company. It shall be the Driver-Owner's responsibility to carry collision and liability insurance on said equipment until it is sold.

"7. It is understood and agreed that the Company does not have any obligation nor does it assume any by this agreement to purchase the equipment from the Driver-Owner.

"8. The Company agrees that it will operate a maximum of three (3) routes during any given period. Any Driver-Owner desiring to sell his equipment during any period when the Company is operating three (3) routes may do so provided he furnish a buyer for his equipment.

"9. In the event the Company decides to terminate its business relationship with the Driver-Owner, the Driver-Owner shall have the protection and receive the same rights granted under this agreement as if he was selling his equipment."

In addition to the written agreement, each distributor must agree orally to certain conditions before being assigned his duties. According to the sales manager, the distributor must agree to aggressively sell Pepsi-Cola, refrain from drinking while working, be honest and not steal from his customers, display the Pepsi-Cola insignia on his truck and maintain the truck in a neat and presentable condition, and wear a blue "Pepsi" uniform while on duty.

Each prospective distributor is required to submit an application, and his financial responsibility is checked by the Employer. Distributors are granted a one-week vacation each of their first five years and a two-week vacation thereafter. Vacations are only granted between September and April, and when a "vacation man" is available to service the route. Where two or more distributors seek vacations at the same time, the one with greater seniority will prevail.

Each distributor is compensated by the difference between the price he receives for his product from customers and the price paid to the Employer and other expenses he must incur. The Employer controls the price it charges the distributor and gives each distributor a list of suggested prices that he may charge. While the distributor is free to charge more or less than the list price, in practice it is almost always followed. Occasionally the Employer will conduct a promotion of one brand or size of soft drink, in which circumstance the distributor's customer receives 4 free cases for each 25 purchased. The Employer furnishes 2 of the free cases; the distributor supplies the other 2. Sales promotions of this sort are conducted at the sole discretion of the Employer.

Each distributor is given a route book which lists the distributor's customers in delivery sequence and notes the number of cases of each size and brand sold to each customer. Before altering the delivery sequence, the distributor is required to report the change to his assigned route supervisor. New customers may be solicited by either the distributor or the route supervisor. The distributor is free to sell to anyone within his route area and the distributors frequently sell the products from their trucks or homes to friends and relatives.

The distributor provides his own uniforms, which must display the Pepsi insignia. The distributor's trucks are painted to each distributor's specifications, although the paint is furnished by the Employer and all trucks are painted in "Pepsi" colors.

The trucks are, therefore, painted in various combinations of red, white and blue. The Employer supplies "Pepsi"

and other brand decals to be used on the trucks and these are placed on the truck at the distributor's direction. The distributors are free to place their own names on the trucks and the record indicates many of them have done so, including the words "owner" or "distributor."

Each distributor is required to buy the vending machines which the previous distributor owned. The vending machines, or vendors as they are referred to in the record, may be placed on the route or kept in storage. In addition to using the distributor's vendor, customers will sometimes arrange to buy or rent vendors from the Employer. At times a customer will request that a distributor's vendor be replaced by a new one owned by the Employer. It is financially advantageous for the distributor to place his vendor with a customer rather than to have the Employer rent or sell its vendor.

While distributors are required to wear uniforms, they are purchased at the distributor's own expense and there is no restriction as to the supplier. The distributor may wear a summer or winter type uniform at his own discretion.

The distributor carries his own liability insurance. However, the Employer has a rule which requires the distributor to furnish it with a copy. The distributor pays for his own license plates, gas, oil and tires. If extensive repairs are needed on the truck, the distributor may borrow one of the Employer's trucks at no expense. There is no requirement imposed on the distributor as to how often tires or other replaceable items are to be changed. The distributors may participate at their own expense in the group health insurance program in which the in-plant employees are enrolled. If the distributor uses the Employer's warehouse to store his truck, he pays a rental fee to the Employer. While the Employer expects the trucks to be kept in a neat appearance, the exact washing schedule is left to the distributor.

Each distributor is free to advertise in his own way and a variety of methods have been used. Some place advertisements in the yellow or white pages of the local telephone book or purchase business cards. Others hand out favors such as pens, pencils or cigarette lighters which display the distributor's name and telephone number. Some distributors also sponsor bowling or baseball teams, or beauty contestants. All of the above is done solely at the expense of the distributor, although business cards can be purchased from the Employer. Display advertising for use by the distributor's customer is furnished free by the Employer.

Each distributor arranges his own work schedule and they may begin deliveries anytime from 5:30 to 9 a.m. Some distributors arrange their schedule so that they are off on Wednesday or Wednesday afternoon. Emergency deliveries are sometimes made in the distributor's car or pickup truck. Normally loading of the distributor's truck is accomplished on the previous afternoon by employees of the Employer.

When the distributor's services are first engaged, he may be assigned to work in the bottling plant for a week for familiarization with the procedures involved. The following week he accompanies a route supervisor on the route and observes the routine. The succeeding week the route supervisor observes the distributor as he performs his duties and offers suggestions. After the first weeks, the route supervisor continues to ride with the distributor periodically. One distributor testified that his route supervisor had accompanied him about 20 times in the last 2½ years. In addition, the route supervisors make regular calls on potential customers.

While each distributor is assigned a particular route, he has no proprietary interest in that route. The distributor purchases only the truck, equipment and inventory from the previous owner. Although the routes were at one time arranged to give the distributors equal territories, the Employer may change the routes at any time. One distributor testified that the Employer had unilater-

ally reduced his route on one previous occasion, and the record indicates the Employer has recently announced that it is going to reduce every distributor's route by 5 percent and create additional routes.

Sales meetings are held periodically where various instructional aids are used to assist the distributors in selling their product. Attendance is taken at these meetings and those absent are required to account for their absence.

The distributors are free to hire helpers at any time and the pay and hours of such helpers are at the discretion of the distributors. Also, the Employer does not make withholding tax, social security, or other usual employer payroll deductions for the distributors as it does for its plant employees.

In determining the status of persons alleged to be independent contractors, the Act requires the application of the right-to-control test. Where the person for whom the services are performed retains the right to control the manner and means by which the result is to be accomplished, the relationship is one of employment. Where control is reserved only as to the result sought, the relationship is that of independent contractor.

As asserted by the Employer, the record contains many factors indicative of independent contractor status. Included among these are the facts that the distributors own, operate, and otherwise are responsible for the maintenance of their own vehicles; hours and conditions of work are not set by the Employer but by the distributors themselves; payroll deductions are not made by the Employer; the distributors are free to hire helpers as they wish; the distributors may advertise under their own, and not the Employer's name; the distributors' earnings are based solely on the amount of merchandise sold by him.

Examination of precedent reveals that these factors although significant, are not controlling, where, as here, other elements indicating an employer-employee relationship are present.

By virtue of the written contract and oral instructions given to new distributors, the Employer retains the right to terminate a distributor at any time, a factor which the Board considers to be of particular significance in establishing an employer-employee relationship. The distributors may only terminate upon 21 days notice. The distributor is permitted to sell only the Employer's product and in practice at the price unilaterally set by the Employer.

The Employer grants yearly vacations and sick leave to the distributors and provides a truck when a distributor's truck is being repaired. Distributors are accompanied from time to time by route managers who offer constructive criticism as to selling techniques. The distributors attend periodic sales meetings held by the Employer for the purpose of providing instruction in sales and advertising techniques so as to obtain additional customers.

Furthermore, the fact that the distributors may work for profit rather than wages does not, in and of itself, establish that they possess the opportunity to make decisions resulting in profit or loss which resemble those decisions made by independent businessmen. The geographical territory assigned to the distributor by the Employer confines and limits the distributor's potential range of income. The distributor retains no proprietary interest in the route assigned to him, and the Employer may, upon its own decision, reduce or change a distributor's assigned route at any time.

From the foregoing, and upon the entire record, I find that the unfettered freedom of operation, characteristic of the entrepreneur, and especially the opportunity to make decisions which will affect profit and loss, has not been established. On the contrary, the evidence discloses that the Employer narrowly circumscribes the distributors' area of operations to an extent that it controls the methods and means as well as the ultimate result sought.