512 F.2d 564
 89 L.R.R.M. (BNA) 2196, 167 U.S.App.D.C. 387,
76 Lab.Cas. P 10,828
 LOCAL 814, INTERNATIONAL BROTHERHOOD OF TEAMSTERS,
CHAUFFEURS, WAREHOUSEMEN, et al., petitioners,
v.
NATIONAL LABOR RELATIONS BOARD, Respondent, Karl J. Leib,
Jr., Intervenor.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
SANTINI BROTHERS, INC., Respondent.
 Nos. 74-1036, 74-1243.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Jan. 15, 1975.
Decided April 30, 1975.
 
 Bruce H. Simon, New York City, of the bar of the Supreme Court of New York, pro hac vice, by special leave of court with whom H. Reed Ellis, New York City, was on the brief for petitioners in 74-1036 and respondent in 74-1243.
 Alan Banov, Atty., N. L. R. B., with whom Peter G. Nash, Gen. Counsel, John S. Irving, Deputy Gen. Counsel, Patrick H. Hardin, Associate Gen. Counsel, Elliott Moore, Deputy Associate Gen. Counsel, and Robert A. Giannasi, Asst. Gen. Counsel, N. L. R. B., were on the brief for respondent in 74-1036 and petitioner in 74-1243.
 Karl J. Leib, Jr., Miami, Fla., was on the brief for intervenor.
 Before BAZELON, Chief Judge, and TAMM and ROBB, Circuit Judges.
 Opinion PER CURIAM.
 
 
 1
 Opinion filed by Chief Judge BAZELON, concurring in part and dissenting in part.
 
 PER CURIAM:
 
 2
 This case involves a determination by the National Labor Relations Board (the Board) that Local 814 of the Teamsters Union violated sections 8(b)(4) and 8(e) of the National Labor Relations Act, 29 U.S.C. §§ 158(b)(4) and 158(e) (1970), by entering into and attempting to enforce a provision of its collective bargaining agreement with Santini Brothers, Inc. For the reasons stated herein, we remand the record for clarification.
 
 
 3
 Prior to 1948, movers of household goods and office furniture in the New York metropolitan area utilized employees represented by Local 814 of the Teamsters Union to perform all aspects of their business. However, in that year, a large interstate moving company began utilizing "owner-operators" for so-called long distance hauling, moves in excess of 500 miles. The owner-operators own the tractors that pull the trailers used in long distance moving, contract with the moving companies for hauling business and generally lease the trailers from the company. This method of performing long distance hauling proved attractive to both drivers and companies, and presently, the twenty New York area carriers that perform the bulk of long distance hauling use owner-operators. Santini Brothers, Inc., one of the largest movers in that area, began using owner-operators in 1962 to counteract the deterioration in its long distance moving business as its best drivers became owner-operators for competitors; by 1967, Santini used owner-operators for virtually all of its long distance moving.
 
 
 4
 Local 814's concern with the practice of using owner-operators first manifested itself in the 1962-1965 collective bargaining agreement between the union and the Moving and Storage Industry of New York, a multi-employer bargaining unit representing approximately 300 area moving and storage companies including Santini. This agreement, and subsequent contracts through 1971, provided that: "the owner-operator, commission or percentage method of operation shall not be practiced on local work covered by this agreement. The percentage or commission method of operation shall likewise not be practiced on long distance moving." These agreements also provided for joint study to explore the effects of utilizing owner-operators for long distance hauling.
 
 
 5
 In the 1971 negotiations between the union and the industry, the union demanded that all persons involved in long distance moving be treated as employees under the contract, regardless of whether they had been defined as owner-operators. From initial opposition, the employers acceded to the union's demands, accepting the following provision in Article 24 of the agreement.
 
 
 6
 A.1. All persons performing long distance driving under contract to an employer covered by this agreement (whether as "owner-operator," "percentage driver," "commission driver," or otherwise) shall be covered by this agreement as employees (hereinafter referred to as contract employees).
 
 
 7
 Since the collective bargaining agreement contained a union security clause, the effect of this provision was to require that the owner-operators join Local 814 or lose their contracts.
 
 
 8
 The union sought to enforce Article 24 in the spring and summer of 1972 by advising Santini that it was violating the agreement and by notifying the owner-operators that they were required to join the union. On October 30, 1972, Local 814 engaged in a work stoppage to protest Santini's failure to implement Article 24. The work stoppage ended only after Santini's President agreed to transmit signed membership applications from the owner-operators as he obtained them and to forbid nonsigners to load or unload in the New York metropolitan area. Several owner-operators refused to apply for membership. Thereafter, Santini allowed those who joined Local 814 to load and unload in New York, but not those who refused to join.
 
 
 9
 On November 8, 1972, Karl J. Lieb, on behalf of several owner-operators, filed unfair labor practice charges against Local 814 and Santini.[1] On June 29, 1973, an Administrative Law Judge (ALJ) found that Local 814 had violated the "secondary boycott" provisions of the National Labor Relations Act[2] and that Local 814 and Santini had entered into an illegal agreement because Article 24 was a prohibited "hot cargo" clause.[3] On January 8, 1974, the Board affirmed this decision without comment. Local 814, Teamsters (Santini Brothers, Inc.) 208 NLRB No. 22 (1974).
 
 
 10
 By adopting the ALJ's opinion, the Board held that the owner-operators were not employees within the meaning of section 2(3) of the Act, 29 U.S.C. § 152(3) (1970), but rather were "independent contractors." Therefore, the Board concluded that Article 24 itself and the union activity aimed at enforcing Article 24 were directed at forcing Santini to engage in conduct prohibited by the Act, specifically to coerce the independent contractors to join the union or to cease doing business with them.
 
 
 11
 Local 814 contends initially that the Board erred in concluding that the union violated sections 8(b)(4) and 8(e) of the Act, for even if the owner-operators were independent contractors, Article 24 is a legitimate work preservation clause.[4] We cannot agree. As written, Article 24 neither establishes union work standards for the subcontracting of work nor requires that specific work be done by members of the bargaining unit. Rather, Article 24 purports to require the owner-operators to join the union by defining them as "employees," and hence subjecting them to the union security agreement. If Article 24 were drafted to require that only members of Local 814 may engage in long distance hauling or that any subcontracting to owner-operators must be consistent with union work standards, the case would be much different. However, the provision before us is clearly a union signatory agreement violative of sections 8(b)(4) and 8(e) if the owner-operators are not "employees."[5]
 
 
 12
 As to this question, the Board adopted the opinion of the ALJ, which concluded that the owner-operators were not employees within the meaning of section 2(3) of the National Labor Relations Act. However, shortly thereafter, the Board also adopted the decision of another ALJ in Local 814, Teamsters (Molloy Brothers Moving and Storage, Inc.), 208 N.L.R.B. No. 43 (1974), which concluded that owner-operators who contracted with another member of the Moving and Storage Industry of New York were employees within the meaning of the Act. We believe the two decisions are factually similar and ostensibly inconsistent. Because the Board has not explained its reasons for reaching different results,[6] see Greater Boston Television Corp. v. F. C. C., 143 U.S.App.D.C. 383, 444 F.2d 841, 850-52 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971), we remand the record for clarification. If the Board finds the two indistinguishable, it should so inform the court. See N. L. R. B. v. Metropolitan Life Insurance Co., 380 U.S. 438, 442, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965).
 
 
 13
 Chief Judge Bazelon dissents from the scope of this remand, arguing that it can only produce a post hoc rationalization for the Board's actions. We cannot agree. This court has continually stressed that we are partners with, rather than adversaries to, the administrative agencies. See, e. g., Greater Boston Television Corp., v. F. C. C., supra, 444 F.2d at 851. As such, we think it only fair to give the agency a full and frank opportunity to explicate its actions before we consider reversal. While the possibility exists that the agency will offer a post hoc rationalization, that possibility also exists under Judge Bazelon's broader proposal. Indeed, we believe that Judge Bazelon's proposal would heighten the possibility that the agency might substitute rationalization for reasoning, since his call for a "thorough reconsideration of the doctrinal quicksand in this area" would place the court firmly in an adversary position to the Board.
 
 
 14
 Moreover, we cannot agree with the dissent's characterization of the circumstances under which the remand for clarification may be utilized. Most recently, this device was utilized in Local 441, IBEW v. N. L. R. B., 167 U.S.App.D.C. 53, 510 F.2d 1274 (1975) the division sought clarification, inter alia, of the Board's position concerning the legal effect of the conduct at issue. We therefore believe that the remand for clarification remains a useful and appropriate device for determining that an agency has engaged in reasoned decision making.
 
 
 15
 So ordered.
 
 
 16
 BAZELON, Chief Judge (concurring in part, dissenting in part):
 
 
 17
 I agree that Article 24 is not a work preservation agreement but rather a union signatory agreement. The validity of the Board's decision thus turns on whether it properly adopted the finding of the Administrative Law Judge that the owner-operators of Santini were "independent contractors" and not "employees". On consideration of that issue, I find myself in a maze of precedents with few standards for decision discernable. I, of course, note that Congress has quite clearly commanded that the common law definition of "independent contractor" be the basic guide for distinguishing between "employees" and "independent contractors."[1] This does not mean that considerations of labor policy re irrelevant[2] but that they be considered in light of the common law test of "control". Under this test the degree of control which an employer exercises over a worker determines whether the worker is an "employee" or an "independent contractor."[3] How great a degree of control must exist, how that control is to be quantified and how various incidents of control are to be weighed comparatively are questions left unanswered by Congress and by the Board in its various efforts in this area. We are, however, required to defer to the Board's determination if that determination involves a reasonable choice among competing considerations.[4]
 
 
 18
 The competing considerations in this case are as follows. On the side of "independence", I notice that the owner-operators own their own "tools", the tractor cab; that they are paid by the job and not by the hour; that they receive no workmen's compensation or retirement benefits; that they are responsible for all costs associated with hauling, including repairs and maintenance, road taxes, living expenses, damage insurance, and packing materials; that they may refuse loads and may determine their routes once they accept a load; and that they may hire their own assistants to aid in loading and driving.[5] On the other hand, in favor of employee status, I find that the "tools", the tractor cab, is leased exclusively to Santini and the driver has no right to use it on jobs other than with Santini; that the payment by the job is largely dependent on set rates established by the ICC, the driver receiving a variable percentage depending on what services he performs; that the owner-operator by custom if not by contract works only for Santini and does not drive for other carriers[6]; that Santini requires driver compliance with workmen's compensation laws, requires certain kinds of liability insurance, requires a deposit of $3,000 to insure driver compliance with various safety and other regulations; that loads must be delivered within a set time; and that Santini's arrangements with United Van Lines require the owner-operators working on United jobs to attend United driver training school and to follow the United drivers' manual.[7] Perhaps more important than all of these factors is the pervasive government regulation of interstate hauling with the attendant rules and procedures imposed upon the licensed carrier (here Santini) and through the carrier on the owner-drivers.[8] Santini, of course, requires that its owner-drivers comply with government regulations. It is not immediately clear to me which way these regulations count, toward "independence", toward "employee" status or neutral on the question of independence.[9]
 
 
 19
 I note one argument drawn from the national labor policy which supports the Board's position. Here the union sought to impose economic sanctions on an employer to force the employer to coerce employees not members of the union to join the union. This is not a case where a group of employees has joined a union and seeks to bargain with the employer. Thus, the definition of "employee" in this case-in a manner unlike a case where the workers seek to bargain after joining a union-involves the § 7 rights of the relevant workers.[10] The Taft-Hartley Act in its essential structure operates to proscribe efforts by unions to garner jurisdiction over employees without a free choice on their part to forego individual bargaining and embrace collective bargaining.[11] Article 24, which operates as a union signatory agreement, is in derogation of this central policy of Taft-Hartley. With this in mind, the union's charge that Santini and the owner-operators have deliberately drawn their agreements to avoid "employee" status is transformed into a powerful argument against the union's position, viz. that the owner-operators exercising their § 7 right not to join a union have opted instead for individual bargaining. The union's apparent remedy under the structure of the NLRB is to organize the owner-operators, to force an alteration in the contracts between the operators and Santini and thereby create an "employee" status. To do this, of course, the union must obtain the consent of the owner-operators which apparently it does not have. The union's attempt to create "employee" status through pressure on the employer to cause indirect pressure on the owner-operators finds no support in nationallabor policy.
 
 
 20
 This argument is, however, defeated for the present by an apparent inconsistency between the Board's decision in this case and in the closely related case of Molloy Brothers Moving and Storage.[12] Molloy also involved Local 814 and the Moving and Storage Industry of New York, and particularly concerned whether the owner-operators of Molloy were employees or independent contractors. An Administrative Law Judge different from the one that decided this case held that the Molloy owner-operators were employees and not independent contractors. The Board also affirmed Molloy without opinion. There is no apparent distinction between Molloy and the case sub judice. While there was more evidence in Molloy of owner-operator compliance with work rules promulgated by Allied Van Lines with whom Molloy Brothers were affiliated, the extent of Molloy's right of control[13] was no larger than Santini's and both extended well beyond the requirements of government regulation through use of drivers' manuals. The Board in its brief suggests that Molloy's health insurance plan and a profit-sharing plan serve to distinguish it from Santini. I do not think, in the absence of Board explanation, that these two relatively minor distinctions are sufficient to justify different results. I further note that the Board's decisions in general on the status of truck drivers who own their vehicles seem difficult to reconcile.[14]
 
 
 21
 The requirement of a reasoned decision is central to judicial review of administrative action. Fulfillment of this requirement mandates an agency to reconcile within reason its precedents and to avoid inconsistent decisions.[15] The urgency of this requirement is underscored when an agency is charged with administering a broad statutory mandate-such as we confront here-and when courts must by necessity defer to the agency judgment. In this case, I face conflicting decisions of Administrative Law Judges, decisions which the Labor Board has chosen to affirm without opinion. These conflicting decisions exist against a background of barely reconcilable precedents and of a failure of the Labor Board to provide a reasoned basis for its decisions regarding the definition of "employee."
 
 
 
 [1]
 On November 10, 1972, the Union requested that Santini discharge 13 owner-operators for not joining the Union and paying dues. Santini refused and another work stoppage occurred on November 20. On January 22, 1973, the Board's Regional Director sought a preliminary injunction against the Union under section 10(l ) of the Act, 29 U.S.C. § 160(l ) (1970). The injunction was granted on March 16, 1973. Danielson v. Local 814, Teamsters, 355 F.Supp. 1293 (S.D.N.Y.1973)
 
 
 [2]
 Section 8(b)(4)(i), (ii)(A), (B), 29 U.S.C. § 158(b)(4)(i), (ii)(A), (B) (1970)
 
 
 [3]
 Section 8(e), 29 U.S.C. § 158(e) (1970)
 
 
 [4]
 See National Woodwork Mfg. Ass'n. v. N. L. R. B., 386 U.S. 612, 87 S.Ct. 1250, 18 L.Ed.2d 357 (1967; Orange Belt Dist. Council No. 48 v. N. L. R. B., 117 U.S.App.D.C. 233, 328 F.2d 534 (1964)
 
 
 [5]
 See Local 1288, Retail Clerks v. N. L. R. B., 129 U.S.App.D.C. 92, 390 F.2d 858, 861-62 (1968); A. Duie Pyle, Inc. v. N. L. R. B., 383 F.2d 772, 777-78 (3rd Cir. 1967), cert. denied, 390 U.S. 905, 88 S.Ct. 819, 19 L.Ed.2d 871 (1968); cf. Denver Bldg. & Constr. Trades Council v. N. L. R. B., 341 U.S. 675, 71 S.Ct. 943, 95 L.Ed. 1284 (1951); Marriot Corp. v. N. L. R. B., 491 F.2d 367 (9th Cir.), cert. denied sub nom. International Ass'n of Machinists v. N. L. R. B., 419 U.S. 881, 95 S.Ct. 146, 42 L.Ed.2d 121 (1974); Local 710, Meat & Highway Drivers v. N. L. R. B., 118 U.S.App.D.C. 287, 335 F.2d 709 (1964); Local 5, Plumbers & Pipefitters v. N. L. R. B., 116 U.S.App.D.C. 100, 321 F.2d 366 (1963), cert. denied, 375 U.S 921, 84 S.Ct. 266, 11 L.Ed.2d 165 (1964); District No. 9, Machinists v. N. L. R. B., 114 U.S.App.D.C. 287, 315 F.2d 33, 36 (1962); Washington Oregon Shingle Weavers Dist. Council, 101 N. L. R. B. 1159 (1952), aff'd, 211 F.2d 149 (9th Cir. 1954). See also N. L. R. B. v. Local 825, Operating Eng'rs, 400 U.S. 297, 91 S.Ct. 402, 27 L.Ed.2d 398 (1971). Of course, if the owner-operators were "employees" (and thus presumably within the union's jurisdiction and certification), then the union's actions are permissible attempts to enforce a union security agreement on its unit employees. Absent state law to the contrary, union security agreements are permitted under present law subject to certain restrictions. NLRB §§ 8(a)(3), (b)(2), (5), 14(b), 29 U.S.C. §§ 158(a)(3), (b)(2), (5), 164(b) (1970). On the relationship of a finding of "independent contractor" status and a finding of a violation of the secondary boycott provisions of the NLRB, see Local 417, Carpet Layers v. N. L. R. B., 151 U.S.App.D.C. 338, 467 F.2d 392, 399-401, 404-06 (1972)
 
 
 [6]
 The Administrative Law Judge in Santini Brothers, although cognizant of his colleague's position in Molloy Brothers, did not attempt to distinguish the two cases
 
 
 [1]
 See NLRB v. United Ins. Co. of America, 390 U.S. 254, 256 & n. 2, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968); Joint Council No. 42, Teamsters v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322, 1326 (1971) and legislative history cited
 
 
 [2]
 See Carnation Co. v. NLRB, 429 F.2d 1130, 1132 (9th Cir. 1970). For this reason I do not find Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947) controlling
 
 
 [3]
 Joint Council No. 42, Teamsters v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322, 1326 (1971), citing Grace v. Magruder, 80 U.S.App.D.C. 53, 148 F.2d 679, 681 (1945); Restatement of Agency (Second) § 220(1), (2) (1957). See NLRB v. Cement Transport, Inc., 490 F.2d 1024, 1027 (6th Cir. 1974); Ace Doran Hauling & Rigging Co. v. NLRB, 462 F.2d 190, 193 (6th Cir. 1972); News-Journal Co. v. NLRB, 447 F.2d 65, 68 (3d Cir. 1971); Carnation Co. v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970); Frito-Lay, Inc. v. NLRB, 385 F.2d 180, 187 (7th Cir. 1967); NLRB v. A. S. Abell Co., 327 F.2d 1, 4 (4th Cir. 1964); Deaton Truck Line, Inc. v. NLRB, 337 F.2d 697, 698-99 (5th Cir. 1964), cert. denied sub nom. Local 612, Teamsters v. NLRB, 381 U.S. 903, 85 S.Ct. 1448, 14 L.Ed.2d 285 (1965)
 While there can be no doubt that Congress intended this "right of control" test to apply, I am impressed by the suggestion of counsel for Local 814 that the better test is one which determines "employee" status on the basis of whether the contested workers are properly represented by the relevant union. This is, I take it, a test virtually identical to the test of whether certain workers belong in the jurisdiction of one union or are part of an appropriate bargaining unit which the union represents. See, e. g., NLRB v. Radio & Television Broadcast Eng'rs, 364 U.S. 573, 81 S.Ct. 330, 5 L.Ed.2d 302 (1961); Mallinckrodt Chem. Works, 162 N.L.R.B. No. 48 (1966). Cf. NLRB v. Southern Seating co., 468 F.2d 1345, 1347-48 & n. 8 (4th Cir. 1972) (distinction between a "supervisor" and an "employee"). The § 7 rights of the workers in dispute may be protected through Labor Board policy on "accretion" to existing units. See Local 455, Retail Clerks v. NLRB, 166 U.S.App.D.C. 422, at 425 & n. 2,
 510 F.2d 802, 805 & n. 12 at 6 & n. 12 (1975).
 
 
 [4]
 See NLRB v. United Ins. Co. of America, 390 U.S. 254, 260, 88 S.Ct. 988, 19 L.Ed.2d 1083 (1968)
 
 
 [5]
 On the legal significance of these factors, see Harrison v. Greyvan Lines, Inc., 331 U.S. 704, 708, 716-19, 67 S.Ct. 1463, 91 L.Ed. 1757 (1947); Joint Council No. 42, Teamsters v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322, 1327-29 (1971); Carnation Co. v. NLRB, 429 F.2d 1130, 1132 (9th Cir. 1970); Associated Independent Owner-Operators, Inc. v. NLRB, 407 F.2d 1383, 1385-87 (9th Cir. 1969); National Van Lines, Inc. v. NLRB, 273 F.2d 402, 406-07 (7th Cir. 1960); Reisch Trucking & Transportation Co., 143 N.L.R.B. 953 (1963)
 
 
 [6]
 Under some, older agreements between Santini and the owner-operators, such as that with Marvin Baggett, Exhibits at 481, 484, and Thomas Wolfe, id. at 468, 471, the owner-operator was subject to termination for driving for another carrier. This provision has been dropped from the newer agreements executed with some drivers at or after the time of the unfair labor practices here in dispute, Exhibits at 38-43, as in the contract with Thomas Wolfe, id. at 450-67. However, even under the newer agreements covering part of Santini's drivers the owner-operator is required to operate his own vehicle and is also required to notify Santini of any carrier business the owner-operator discovers and to permit Santini to have the right of first refusal of that business. Exhibits at 452-53. Furthermore, it seems inherently persuasive that an owner-operator would want to operate his own equipment and would consider himself bound to it. The Administrative Law Judge apparently found that the owner-operators, if they wished to work overtime, can drive for other carriers with Santini's permission (one assumes as "moonlighting"). Joint App. at 21 n.14
 
 
 [7]
 United and Santini have three different types of business arrangements variously called "permanent" lease; "master" lease and "peak" lease. virtually all of Santini's 24 owner-operators work on United jobs under one of these business arrangements. Local 814, Teamsters (Santini Bros.), 208 N.L.R.B. No. 22 (1974), Joint App. at 13 (opinion of ALJ). These lease arrangements all require Santini to provide personnel for United jobs who comply with all of United's business rules. Exhibits at 648, 651. United promulgates a variety of rules through its owner's manual which is reprinted in Exhibits at 789-948. One of the rules contained in the owner's manual is that the driver must attend the United training school, if he is on a so-called "permanent" lease, as are 9-10 of Santini's drivers, id. at 792. The older agreements between Santini and its owner-operators, many of which were still in effect at the time of the unfair labor practices, Exhibits at 38-43, expressly required the owner-operators to
 follow the rules in the United manual. Exhibits at 471, 484. The newer agreements eliminate this express provision, id. at 450-67, but the provisions in the contracts between Santini and United remain the same and it is reasonable to expect that United still expects to have drivers who comply with United rules. Apparently the practice is that if United is unhappy with any Santini drivers because of failure to live up to United's expectations, the driver is simply taken off United business, cf. Local 814, Teamsters (Santini Bros.), supra, Joint App. at 27, but since virtually all of Santini's owner-operators work on United jobs, one may assume either total compliance with United rules or termination by Santini of offending drivers under the newer agreements' termination clause, Exhibits at 464 (termination at will of Santini on thirty days notice). The Administrative Law Judge made no findings on the effect of the owner's manual or on the effect of the newer agreements on United's right to enforce the
 provisions of the manual. There was testimony in the record that Santini has no record of distributing the United manual and no policy of enforcing it (although we may assume that Santini would affirmatively respond to a United complaint about a particular driver), but as is noted in note 13 infra, it is the right of control and not the actual exercise of the right which is central to the legal definition of "employee". Absent further explanation from the Labor Board, I think it established that United through Santini has at least the right of control on the basis of the requirements of the owner's manual.
 
 
 [8]
 The various governmental regulations promulgated by the ICC and the Department of Transportation relates to safety, accident reporting, vehicle inspection, use of drugs or alcohol, logging requirements, a carrier (Santini)-imposed exclusive lease on the owner-operator's tractor cab and the shipper's rates which define the owner-operator's compensation. Santini, as the licensed carrier, is responsible for the performance of these duties and may not delegate its responsibility to the owner-operator. See Local 814, Teamsters (Santini Bros.), 208 N.L.R.B. No. 22 (1974), Joint App. at 25-26 (opinion of ALJ)
 
 
 [9]
 See NLRB v. Cement Transport, Inc., 490 F.2d 1024, 1027 (6th Cir. 1974); Ace Doran Hauling & Rigging Co. v. NLRB, 462 F.2d 190, 194 (6th Cir. 1972). See also NLRB v. Pony Trucking, Inc., 486 F.2d 1039, 1040 (6th Cir. 1973); Aetna Freight Lines, Inc., 194 N.L.R.B. 740, 741 (1971) (Miller, Member, concurring)
 
 
 [10]
 29 U.s.C. § 157 (1970) ("Employees ... shall also have the right to refrain from" collective bargaining). Cf. §§ 8(b)(1), 14(b), 29 U.S.C. §§ 158(b)(1), 164(b) (1970); International Ass'n of Machinists v. Street, 367 U.S. 740, 81 S.Ct. 1784, 6 L.Ed.2d 1141 (1961); NLRB v. Exchange Parts Co., 375 U.S. 405, 84 S.Ct. 457, 11 L.Ed.2d 435 (1964); Local 633, Teamsters v. NLRB, 166 U.S.App.D.C. 157, 509 F.2d 490, 493 (D.C.Cir.1974). This § 7 right is most profoundly evident in the secondary boycott prohibition as that prohibition has developed over the years
 
 
 [11]
 See S.Rep. No. 105, 80th Cong., 1st Sess. 5-7 and passim (1947). Numerous provisions in the newer agreements between Santini and the owner-operators state expressly an intention to avoid collective bargaining. Most obvious is the provision that states it is the intent of the contracting parties that the owner-operator is to be an independent contractor. Exhibits at 463; see id. at 450-67
 
 
 [12]
 Local 814, Teamsters (Molloy Bros.), 208 N.L.R.B. No. 43 (1974) decided nine days after the Santini case
 
 
 [13]
 It is the right of control and not the exercise of that right which is relevant to a finding of independent contractor status. See NLRB v. Cement Transport, Inc., 490 F.2d 1024, 1027 (6th Cir. 1974); Joint Council No. 42, Teamsters v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322, 1326 (1971); Carnation Co. v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970); NLRB v. A. S. Abell Co., 327 F.2d 1, 4 (4th Cir. 1964). The Administrative Law Judge in the Santini case paid very little attention to the United owner's manual whereas the Administrative Law Judge in Molloy found that the Allied owner's manual was the source of a number of carrier restrictions over and above that required by the government. Local 814, Teamsters (Molloy Bros.), 208 N.L.R.B. No. 43 (1974), at 6-8 & n.7 (opinion of ALJ). In Molloy the Administrative Law Judge also relied on various Allied bulletins; there is evidence of various United bulletins in the record sub judice. Exhibits at 949-50, 977-79, 982-83, 988-99, 1007-15b
 This seems to be the source of inconsistency.
 
 
 [14]
 Compare Reisch Trucking & Transportation Co., 143 N.L.R.B. 953 (1963); Fleet Transport Co., 196 N.L.R.B. 436 (1972); Conley Motor Express, Inc., 197 N.L.R.B. No. 57 (1972); Gold Metal Baking Co., 199 N.L.R.B. No. 132 (1972); Portage Transfer Co., 204 N.L.R.B. No. 117 (1973); George Transfer & Rigging Co., 208 N.L.R.B. No. 25 (1974) with Deaton, Inc., 187 N.L.R.B. 780 (1971); Aetna Freight Lines, Inc., 194 N.L.R.B. 740 (1971); Florida Texas Freight, Inc., 197 N.L.R.B. No. 158 (1972); Pony Trucking, Inc., 198 N.L.R.B. No. 59 (1972), aff'd, NLRB v. Pony Trucking, Inc., 486 F.2d 1039 (6th Cir. 1973). See also the various determinations of the Courts of Appeal, NLRB v. Cement Transport, Inc., 490 F.2d 1024 (6th Cir. 1974); Ace Doran Hauling & Rigging Co. v. NLRB, 462 F.2d 190 (6th Cir. 1972); Joint Council No. 42, Teamsters v. NLRB, 146 U.S.App.D.C. 275, 450 F.2d 1322 (1971); Associated Independent Owner-Operators, Inc. v. NLRB, 407 F.2d 1383 (9th Cir. 1969); Maxwell Co. v. NLRB,
 414 F.2d 477 (6th Cir. 1969); Deaton Truck Lines, Inc. v. NLRB, 337 F.2d 697 (5th Cir. 1964), cert.denied sub nom. Local 612, Teamsters v. NLRB., 381 U.S. 903, 85 S.Ct.1448, 14 L.Ed.2d 285 (1965); National Van Lines, Inc. v. NLRB, 273 F.2d402 (7th Cir. 1960). Cases involving the status of distributors involve different problems and hence are distinguishable. See, e. g., NLRB v. Pepsi-Cola Bottling Co. of Mansfield, 455 F.2d 1134 (6th Cir. 1972); News- Journal Co. v. NLRB, 447 F.2d 65 (3d Cir. 1971); Herald Co. v. NLRB, 444 F.2d 430 (2d Cir. 1971).
 
 
 [15]
 See NLRB v. Metropolitan Life Ins. Co., 380 U.S. 438, 442, 85 S.Ct. 1061, 13 L.Ed.2d 951 (1965) (Goldberg, J.); NLRB v. Gibson Products Co., 494 F.2d 762, 767 (5th Cir. 1974); May Department Stores Co. v. NLRB, 454 F.2d 148, 151-52 (9th Cir. 1972); Herbert Harvey, Inc. v. NLRB, 137 U.S.App.D.C. 282, 424 F.2d 770, 780 (1969); Carnation Co. v. NLRB, 429 F.2d 1130, 1134 (9th Cir. 1970); cf. Barrett Line, Inc. v. United States, 326 U.S. 179, 65 S.Ct. 1504, 89 L.Ed. 2128 (1945), discussed L. Jaffe, Judicial Review of Administrative Action 586-88 (1965); Secretary of Agriculture v. United States, 347 U.S. 645, 74 S.Ct. 826, 98 L.Ed. 1015 (1954); Columbia Broadcasting System, Inc. v. FCC, 147 U.S.App.D.C. 175, 454 F.2d 1018, 1026-27 (1971); Marco Sales Co. v. FTC, 453 F.2d 1, 7 (2d Cir. 1971); Mesa Petroleum Co. v. FPC, 441 F.2d 182, 192 (5th Cir. 1971); Melody Music, Inc. v. FCC, 120 U.S.App.D.C. 241, 345 F.2d 730 (1965); City of Lawrence v. CAB, 343 F.2d 583 (1st Cir. 1965)
 See generally Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 850-52 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971).
 The Court decides to remedy the situation by remanding the record for supplementation on the issue of the inconsistency between Molloy and the case sub judice. I agree that the Board must develop a distinction between the cases before this Court may affirm its decision, but I do not think that a remand of the record alone is, on the facts of this case, a sufficient remedy for the Board's failure to provide a reasoned decision of this case. This case in my view presents a classic example of where a diligent reviewing court could determine through a variety of factors that the agency had not given the problem a "hard look", Greater Boston Television Corp. v. FCC, 143 U.S.App.D.C. 383, 444 F.2d 841, 850-52 (1970), cert. denied, 403 U.S. 923, 91 S.Ct. 2229, 29 L.Ed.2d 701 (1971). A remand of the record alone can produce only a post hoc rationalization of the inconsistency between Molloy and this case. Such post hoc rationalizations have been consistently held to be inadequate to justify an otherwise vulnerable decision.[16] The reason of this rule is that an agency might simply search for an explanation, in this case a distinction, to satisfy the requirement of a reasoned decision, regardless of whether the agency would have been genuinely impressed with the explanation or distinction if the matter were properly considered in the first instance. The wisdom of this rule is particularly evident when the agency's error is the failure to give a "hard look" in the first place. Indeed, post hoc rationalizations are hardly the instrument to develop the standards for decision which are so conspicuously lacking in this area. It is my understanding that the record should be remanded for supplementation only when there are minor factual confusions or conflicts within an agency decision. I know of no authority for the proposition that the record may be remanded for supplementation when the agency has failed to comply with the requirement of a reasoned decision. I would reverse the Board and remand for a thorough reconsideration of the doctrinal quicksand in this area.
 
 
 [16]
 See Citizens to Preserve Overton Park v. Volpe, 401 U.S. 402, 419, 91 S.Ct. 814, 28 L.Ed.2d 136 (1971); cf. FPC v. Texaco, Inc., 417 U.S. 380, 397 (1974); NLRB v. Local 347, Food Store Employees, 417 U.S. 1, 9-10, 94 S.Ct. 2074, 40 L.Ed.2d 612 (1974)
 There is nothing in Local 441, Electrical Workers v. NLRB, 167 U.S.App.D.C. 53, 510 F.2d 1274 (1975) which is to the contrary. That case involved a remand because of a confusion on the Board's handling of a conflict in testimony and the legal implications to be drawn therefrom. As such, a confusion in testimony, it was clearly proper to remand for supplementation of the record. The case sub judice, on the other hand, concerns a failure to supply a reasoned decision. Such failures may not be rectified by a remand of the record alone.